RHOMBAR CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5838–64. Filed October 26, 1966.

*Saul Duff Kronovet* and *Frederick Gelberg*, for petitioner.
*James Q. Smith*, for respondent.

ATKINS, *Judge:* The respondent determined deficiences in income tax (including the accumulated earnings tax) for the taxable years ended January 31, 1959, 1960, 1961, and 1962, in the respective amounts of $55,333.09, $37,336.78, $19,803.51, and $24,227.41.

The issues raised by the pleadings are: (1) Whether assessment of any deficiency for the taxable year 1959 is barred by the statute of limitations; (2) whether the amounts of installment obligations which were payable, but unpaid, in the taxable years 1959 and 1960 constituted taxable income to the petitioner in those years; (3) whether any portion of the amount of installment obligations to the petitioner in the taxable years 1959, 1960, 1961, and 1962 constituted ordinary income; (4) whether there should be included in income for the taxable year 1959 amounts which had been accrued and deducted in the taxable year ended January 31, 1953, as amounts payable to a former employee, but no part of which was paid prior to April 6, 1964; and (5) whether for any of the taxable years 1959, 1960, 1961, and 1962 the petitioner is liable for the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioner is a New York corporation with an annual accounting period ending on January 31. Its Federal income tax return for its taxable year ended January 31, 1959, was filed on April 15, 1959, with the district director of internal revenue for the Manhattan District, New York, N.Y., and its Federal income tax returns for its taxable years ended January 31, 1960, 1961, and 1962, were filed with the district director of internal revenue for the Manhattan District, New York, N.Y.

The petitioner was organized as John Stuart, Inc., in 1934 to carry on business as a distributor of fine furniture. In 1952 its name was changed to Rhombar Co., Inc. It had 200 shares of common stock

and 400 shares of nonvoting preferred stock held as follows: Herbert M. Rothschild, 108 shares of common; Robert F. Rothschild (Herbert's son), 45 shares of common; Barbara R. Michaels (Herbert's daughter), 45 shares of common; Herman S. Gelbin (unrelated), 1 share of common; John L. Stuart (unrelated), 1 share of common; and Nannette F. Rothschild'(Herbert's wife), 400 shares of nonvoting preferred.

Prior to 1952 the petitioner sold furniture in New York City. Operating on the same premises as the petitioner was a corporation known as John Widdicomb Co., Inc., New York, half of the outstanding stock of which was owned by John L. Stuart and half of which was owned by members of the Rothschild family. That company was the exclusive distributor in the New England, New York, and Washington, D.C., areas for the furniture manufactured by John Widdicomb Co., Inc. (Grand Rapids), which was wholly owned by John L. Stuart. The petitioner did not sell the line of furniture sold by John Widdicomb Co., Inc., New York.

On June 30, 1952, the petitioner, pursuant to an agreement dated June 9, 1952,[1] sold to John Widdicomb Co., Inc., New York, its goodwill, fixed assets, merchandise inventory, accounts receivable, prepaid expenses and advances to salesmen, and an item designated as "Assoc. Reciprocal Exchanges." With respect to the first two items the agreement of sale provided as follows:

4. Seller further agrees to sell and Purchaser further agrees to purchase the following assets of Seller as same shall exist on June 30, 1952:

(d) Seller's good will, including but not limited to the exclusive right to the name "John Stuart, Inc." and the name "John Stuart", trade marks, trade names, designs, design patents, customers' lists, and contracts with suppliers under which Seller acts as selling agent or dealer.

Seller agrees that on or about June 30, 1952 it will change its corporate name to some name not including the name "John Stuart" or any similar name, that it will execute such instruments and take such measures as may be necessary on its part to enable Purchaser to adopt the name "John Stuart Inc." as its corporate name, and that it will discontinue its furniture business.

(e) Seller's fixed assets, including but not limited to decorations, backgrounds, room settings, accessories, signs, pictures, paintings, photographs, lamps, lighting fixtures, floor coverings, furniture covers, air conditioning equipment, partitions, office equipment and machinery, and furniture handling and repairing equipment.

\*     \*     \*     \*     \*     \*     \*

---

[1] At June 9, 1952, the stock of John Widdicomb Co., Inc., New York, was held as follows: Robert F. Rothschild, 1,999 shares of voting common and 1,599 shares of nonvoting common (49.975 percent of voting power) ; Barbara R. Michaels, 640 shares of voting common and 512 shares of nonvoting common (16 percent of voting power) ; Herbert M. Rothschild, 1 share of voting common and 1 share of nonvoting common (.25 percent of voting power) ; and John L. Stuart, 360 shares of voting common and 1,000 shares of voting preferred (34 percent of voting power). Each share of voting stock, whether common or preferred, had equal voting rights for normal corporate purposes.

5. The price to be paid by Purchaser to Seller for the property contracted to be sold pursuant to article 4 hereof shall be as follows:

For item (d), the sum of Seven hundred and fifty thousand dollars ($750,000.00).

For item (e), the value of said item as appraised by Herbert M. Rothschild and John L. Stuart, or if they cannot agree, by The American Appraisal Co., Inc., or by any other appraiser selected by the parties.

6. Payment of the price for said items (d) and (e) shall be made in forty (40) equal quarter-annual installments, the first on November 15, 1952 and subsequent ones each three (3) months thereafter. Within ten (10) days after the price for item (e) has been determined, Purchaser shall execute and deliver to Seller promissory notes as evidence of Purchaser's obligation to pay the installments of the price of items (d) and (e), a separate note to be executed and delivered for each installment. Said notes * * * shall provide that (i) the maker shall have the privilege of prepayment at any time; and (ii) in the event of default in the payment of any of said notes for thirty (30) days, the balance of the notes shall at the option of the holder thereof forthwith become due and payable.

All the property referred to in paragraphs 4(d) and 4(e) of the agreement had an adjusted basis of zero in the hands of the petitioner.

The property referred to in paragraph 4(e) of the agreement consisted of property which had been included in a schedule of assets prepared on or about May 31, 1952. An appraisal was duly made of such assets as provided in the agreement and a price of $150,000 was agreed upon.

In accordance with the agreement John Widdicomb Co., Inc., New York delivered to the petitioner 40 equal quarter-annual serial promissory notes, each in the amount of $22,500 (totaling $900,000), the first note being due on November 15, 1952. The notes did not bear interest. Each note contained the provision that the maker should have the privilege of prepayment at any time, and the provision that upon default for 30 days in payment of any note each of the remaining notes should become immediately due and payable without notice, at the option of the holder. At the time of the transaction the petitioner changed its name to Rhombar Co., Inc., and the purchaser, John Widdicomb Co., Inc., New York changed its name to John Stuart Inc. At the same time the petitioner redeemed the one share of stock owned by Herman S. Gelbin and the one share of stock owned by John L. Stuart.

The property referred to in paragraph 4(e) of the agreement, and which was sold for $150,000, had been valued in the schedule of assets at an amount of $210,006.45. Included in such listed property was office equipment and a relatively small amount of supplies of a total valuation of $36,437.70. The supplies were listed at a valuation of $179. None of such property constituted inventory or property

held for sale to customers. All the property had been held by the petitioner for more than 6 months.

Also included in such listed property were various accessories for showroom display, such as bedspreads, lamps, and pieces of ceramic ware, at a total valuation of $77,358.75. Such assets were used by the petitioner for display, and did not constitute inventory or property held for sale to customers. Seventy-five percent in value of this property had been held by the petitioner for more than 6 months prior to the date of its sale by the petitioner on June 30, 1952.

Included in such listed property were leasehold improvements (such as room settings and other appurtenances attached to the walls and ceilings of the building) at a total valuation of $96,210. Such property did not constitute inventory or property held for sale to customers. Some of these improvements were made when the basement and the second floor were remodeled in 1949 and 1950, respectively. Seventy-five percent in value of this property had been held by the petitioner for more than 6 months prior to the date of its sale by the petitioner on June 30, 1952.

On July 18, 1952, Herbert M. Rothschild, Robert F. Rothschild, and Barbara R. Michaels entered into a voting trust agreement whereby their stock interests in the purchasing corporation, John Stuart Inc., were transferred to themselves and Nannette F. Rothschild as voting trustees. The agreement provided that the concurrence of a majority of the voting trustees was necessary and sufficient for any action or for the execution of any instrument by the voting trustees as such. In the agreement it was provided that the voting trust should continue for a period of 10 years unless terminated by action of a majority of the voting trustees, by the death of both Herbert M. and Nannette F. Rothschild, or by payment of all of the promissory notes given to the petitioner by John Stuart Inc.

On April 28, 1953, the petitioner wrote the respondent requesting permission to change from the accrual method to the cash receipts and disbursements method of accounting, effective for its taxable year ending January 31, 1954. In its letter the petitioner made no mention of the serial promissory notes with a total face value of $900,000. The petitioner's requested change of accounting method was approved by the respondent, based upon the facts presented in petitioner's letter and subject to the petitioner's agreement to certain conditions.

The serial promissory notes executed by John Stuart Inc. in favor of petitioner were paid as they came due through November 15, 1957, except that the notes due on February 15, 1956, August 15, 1956, February 15, 1957, and August 15, 1957 were prepaid on December 23, 1953. At the time of the prepayments John Stuart Inc. had a rela-

tively good cash position and it was expected that this would continue to be so for the next year or two. However, it was expected that its rental expense would increase in 1957. It was therefore deemed advisable to make the prepayments and secure the agreement of the petitioner to permit the deferral, for 36 months, of four notes which would later become due, namely, the notes due February 15 and August 15, 1960, and February 15 and August 15, 1961. At that time John Stuart Inc. contemplated that it might be difficult to make payments due in 1958 and 1959 and that some further arrangement with the petitioner might be necessary.

In 1958 poor business and large cash outlays had impaired the working capital position of John Stuart Inc. Under an informal agreement with the petitioner payment was deferred on the notes due on February 15, May 15, and August 15, 1958, and although the note due on November 15, 1958, was timely paid, it was contemplated that payment would not be made on the note due on February 15, 1959 (and, in fact, the notes due on February 15 and May 15, 1959, were not paid). A special meeting of the board of directors of John Stuart Inc. was held on January 10, 1959, to review its stringent current cash position. At that time it had undertaken an expanded pension plan and group insurance program which would increase its annual cost by about $90,000; it had entered into a program of fabricating a new line of furniture which would require an investment for that year in excess of $100,000, and require the making of substantial advances in order to accumulate inventory; and it contemplated, in the interest of economy, the purchase of trucks, in lieu of the existing practice of renting trucks, which would require the outlay of $60,000 to $70,000. James V. Stuart expressed serious concern over the corporation's working capital position. He recommended that a plan be set up for refinancing the long-term debt to provide a reduced annual schedule of payments and to remove the overhanging demand notes of $90,000 (these being the unpaid notes above referred to which had become due on February 15, May 15, and August 15, 1958, and the note due on February 15, 1959, which it was contemplated would not be paid). At such meeting Stuart also expressed the opinion that it was imprudent for John Stuart Inc. to continue with its site acquisition program (the corporation's investment up to that time in such program was $587,600 and the estimated cost of completing the program was $350,000), and suggested that its investment in the realty be sold. On May 1, 1959, another special meeting of the board of directors was held at which the plan to refinance the corporation's long-term debt was approved. A proposed

sale of the company's investment in real estate to Furniture Service, Inc., was also approved.[2]

Pursuant to the above authorization, John Stuart Inc. on May 28, 1959, entered into an agreement with the petitioner whereby it agreed to pay the petitioner interest of 4½ percent on each installment payment then past due from the date of maturity until May 31, 1959. It was further agreed that all the indebtedness of John Stuart Inc. to petitioner then outstanding, including the past due and unpaid installments, should mature and be paid in installments of $17,500 on June 30 and December 31 in each of the years 1959, 1960, and 1961; in installments of $20,000 due on June 30 and December 31 in each of the years 1962 and 1963; and in a final installment of $220,000 due on June 30, 1964. New notes bearing interest at the rate of 4½ percent from June 1, 1959, were given for this indebtedness (in the total amount of $405,000), and the prior notes executed by John Stuart Inc. were surrendered and canceled.

John Stuart Inc. paid the six installments of $17,500 maturing in 1959, 1960, and 1961 leaving a balance due of $300,000.

On January 2, 1962, the petitioner and John Stuart Inc. entered into a new agreement with respect to the remaining balance of $300,000. On that date $65,000 thereof was paid and it was agreed that the remaining balance of $235,000 should be paid in installments of $12,500 each, due on June 30 and December 31 in each of the years 1962, 1963, 1964, and 1965, and a final installment of $135,000 due on June 30, 1966. New promissory notes were given for these installments, bearing interest at the rate of 4½ percent per annum.

The eight installments of $12,500 each were paid by John Stuart Inc. leaving a balance due at December 31, 1965, of $135,000.

In its income tax returns for the taxable years ended January 31, 1959, 1960, 1961, and 1962, the petitioner reported as long-term capital gain the full amount of the payments made to it by John Stuart Inc. on the promissory notes in the respective amounts of $22,500, $35,000, $35,000, and $100,000. It did not report as income for the taxable years ended January 31, 1959 and 1960, the respective amounts of $67,500

---

[2] The interest of John Stuart Inc. in the real estate was indirect. It and Furniture Service, Inc. (a corporation owned entirely by Robert F. Rothschild), as equal stockholders had incorporated four corporations in the State of New York between the dates of May 12, 1955, and Aug. 16, 1957. Such four corporations had purchased real property and assembled the block on 2d Ave. between 57th St. and 58th St. in New York City. Pursuant to the authorization of its board of directors, John Stuart Inc., on May 27, 1959, sold its 50-percent stock interest in the four real estate corporations to Furniture Service, Inc., for $647,996.07, receiving $117,996.07 in cash and $530,000 in promissory notes. The sale was made after John Stuart Inc., had obtained from its real estate consultant an appraisal showing a value for the entire tract of $1,302,000.

In June 1959 Furniture Service, Inc., acquired this real property by liquidation of the four real estate corporations and later, on Jan. 31, 1962, sold such real estate to an unrelated corporation for $3,150,000. In pursuance of a plan of liquidation Furniture Service, Inc., distributed to Robert F. Rothschild within a year thereafter cash of $355,000 and other assets of $2,318,606.15.

and $45,000 representing the face amount of notes due and payable, but unpaid, in those years. Its income tax return for its taxable year ended January 31, 1959, was filed on April 15, 1959. Therein gross income was reported in the amount of $70,357.26.

In the notice of deficiency, which was mailed on November 3, 1964, the respondent determined that the petitioner had constructively received as ordinary income in the taxable years ended January 31, 1959 and 1960, the respective amounts of $67,500 and $45,000 representing the notes due, but unpaid, in those years. He therefore increased the reported gross income by those amounts.

In the notice of deficiency the respondent also determined that five-sixths of the amounts of the notes which were reported as income by the petitioner in its returns for the taxable years ended January 31, 1959, 1960, 1961, and 1962, represented proceeds from the sale of goodwill and therefore constituted long-term capital gain as reported. The remaining one-sixth of the payments reported in the return for the taxable year ended January 31, 1959, was held to be ordinary income, and the remaining one-sixth of the payments reported in the returns for the taxable years ended January 31, 1960, 1961, and 1962, was held to be ordinary income, except to the extent of $35, $35, and $100, respectively.

As of January 31, 1953, the petitioner had accrued on its books an amount of $16,926.54 as being payable to Herman S. Gelbin who was an employee of petitioner during that year. The amount of $16,926.54 was broken down on petitioner's balance sheet as an account payable to Gelbin in the amount of $13,350.84 and accrued expense of $3,575.70. The petitioner paid Gelbin $2,500 on April 6, 1964, $4,300 on July 30, 1964, and $2,500 on August 2, 1965, which payments were charged to the Gelbin account payable. As of the time of the trial no other payments had been made to Gelbin.

In the notice of deficiency the respondent increased the petitioner's reported gross income for the taxable year ended January 31, 1959, by the amount of $16,926.54, stating:

The balance sheet of the corporation at January 31, 1959, discloses an Accounts Payable balance of $13,350.84 and an Accrued Expenses balance of $3,575.70. It has been determined that the corporation realized a tax benefit in prior years as a result of these charges totalling $16,926.54, but that the expenses charged were not paid within a reasonable time as evidenced by the above-stated balances. Accordingly the corporation's reported income subject to tax has been increased by $16,926.54 under authority of section 446(b) of the Internal Revenue Code.

Since 1952 no office or telephone number for petitioner has ever been listed in the New York telephone directory.

The petitioner's profit and loss statements for periods subsequent to the sale of its business assets to John Stuart Inc. show that its gross

income (before any adjustments by the Internal Revenue Service) consisted of the following:

| | Dividends | Interest | Capital gain [1] | Other income |
|---|---|---|---|---|
| Short period July 1, 1953, to Jan. 31, 1954___ | $39, 205. 79 | $7, 893. 75 | $179, 158. 22 | $474. 95 |
| Taxable year ended Jan. 31— | | | | |
| 1955_____ | 43, 381. 45 | 7, 778. 03 | 94, 853. 35 | _____ |
| 1956_____ | 55, 460. 62 | 4, 353. 79 | 136, 905. 69 | _____ |
| 1957_____ | 59, 457. 97 | 8, 738. 91 | 75, 910. 27 | 8. 27 |
| 1958_____ | 55, 091. 38 | 11, 607. 89 | 0 | 17. 28 |
| 1959_____ | 46, 211. 76 | 14, 475. 62 | 9, 659. 21 | 10. 67 |
| 1960_____ | 50, 702. 44 | 23, 386. 02 | 37, 965. 74 | 14. 97 |
| 1961_____ | 54, 215. 53 | 20, 627. 49 | 78, 326. 94 | 7. 44 |
| 1962_____ | 61, 129. 27 | 14, 681. 25 | 398, 435. 42 | _____ |
| 1963_____ | 62, 631. 73 | 10, 293. 75 | 39, 858. 62 | _____ |

[1] The capital gain shown consisted of gain from sales of securities and the payments actually received on the installment obligations hereinabove referred to.

The amounts of earnings, dividends paid, and accumulated earnings (not including the unpaid balance of the serial promissory notes receivable outstanding at the respective dates) shown in the petitioner's income tax returns filed since it closed its activities in the furniture business are as follows:

| FYE Jan. 31— | Net income before taxes | Dividends paid [1] | Surplus at year end |
|---|---|---|---|
| 1954_____ | $226, 080. 93 | $700 | $1, 167, 648. 74 |
| 1955_____ | 132, 259. 10 | 700 | 1, 267, 345. 43 |
| 1956_____ | 185, 707. 17 | 700 | 1, 418, 629. 18 |
| 1957_____ | 135, 103. 49 | 700 | 1, 538, 080. 98 |
| 1958_____ | 61, 509. 81 | 700 | 1, 574, 759. 18 |
| 1959_____ | 68, 134. 06 | 700 | 1, 663, 181. 77 |
| 1960_____ | 109, 316. 23 | 700 | 1, 757, 691. 87 |
| 1961_____ | 149, 374. 64 | 700 | 1, 896, 099. 54 |
| 1962_____ | 468, 549. 53 | 700 | 2, 277, 190. 43 |
| 1963_____ | 49, 827. 58 | 700 | 2, 382, 494. 55 |

[1] The annual dividends of $700 were paid on preferred stock. No dividends were ever declared or paid on common stock during these years.

As of the end of each of its taxable years ended January 31, 1945 through 1963, the petitioner's balance sheets disclosed the following assets:

| TYE Jan. 31— | Cash and receivables | Inventories | U.S. Treasury notes | Other investments | Miscellaneous |
|---|---|---|---|---|---|
| 1945_____ | $211, 438. 93 | $86, 737. 26 | $62, 000. 00 | _____ | $2, 259. 54 |
| 1946_____ | 93, 487. 73 | 115, 030. 60 | 262, 531. 25 | _____ | 1, 686. 21 |
| 1947_____ | 86, 315. 92 | 166, 827. 25 | 328, 599. 98 | _____ | 2, 298. 83 |
| 1948_____ | 170, 494. 78 | 185, 638. 79 | 509, 694. 91 | _____ | 1, 533. 90 |
| 1949_____ | 390, 338. 48 | 238, 163. 75 | 584, 063. 66 | _____ | 2, 939. 57 |
| 1950_____ | 151, 243. 28 | 136, 938. 95 | 687, 234. 45 | _____ | 7, 878. 87 |
| 1951_____ | 661, 767. 12 | 296, 469. 75 | 736, 806. 08 | $93, 062. 50 | 12, 648. 90 |
| 1952_____ | 1, 504, 345. 00 | 398, 421. 21 | 536, 599. 80 | 79, 075. 00 | 18, 934. 27 |
| 1953_____ | 1, 036, 563. 68 | | | 729, 622. 71 | 1, 356. 25 |
| 1954_____ | 836, 588. 37 | | | 1, 152, 058. 01 | _____ |
| 1955_____ | 670, 877. 29 | | | 1, 303, 071. 48 | _____ |
| 1956_____ | 630, 397. 84 | | | 1, 408, 727. 70 | _____ |
| 1957_____ | 564, 460. 24 | | | 1, 533, 913. 68 | 5, 000. 00 |
| 1958_____ | 463, 184. 27 | | | 1, 610, 017. 96 | 5, 000. 00 |
| 1959_____ | 527, 541. 05 | | | [1] 1, 615, 423. 87 | 5, 000. 00 |
| 1960_____ | 470, 242. 18 | | | [1] 1, 743, 137. 96 | 5, 000. 00 |
| 1961_____ | 440, 515. 08 | | | [1] 1, 885, 516. 57 | 5, 000. 00 |
| 1962_____ | 351, 756. 73 | | | [1] 2, 332, 192. 17 | 5, 000. 00 |
| 1963_____ | 242, 568. 28 | | | 2, 428, 933. 16 | 5, 000. 00 |

[1] The fair market value of these investments (consisting of preferred and common stocks and bonds) at the respective dates were $3,353,348, $2,500,763, $3,148,196, and $3,720,628, respectively.

In the years 1959–63 Herbert M. and Nannette F. Rothschild (who filed joint income tax returns) and Robert F. Rothschild and his wife (who also filed joint income tax returns) were in surtax brackets (not including capital gains) as shown below (per tax returns):

| Year | Herbert M. and Nanette F. Rothschild (surtax bracket percent) | Robert F. Rothschild and wife |
|---|---|---|
| 1959 | 65 | 69 |
| 1960 | 69 | 69 |
| 1961 | 72 | 69 |

Prior to the issuance of the notice of deficiency in this case, the respondent on July 23, 1964, sent a notification to the petitioner in accordance with the provisions of section 534(b) of the Internal Revenue Code of 1954 stating that he proposed to issue a notice of deficiency for the taxable years ended January 31, 1959, 1960, 1961, and 1962, setting forth an amount with respect to section 531 of the Code relating to the accumulated earnings tax. On September 9, 1964, the petitioner submitted a statement to the respondent, pursuant to section 534(c) of the Code, in which it stated in part:

At all times during the fiscal years ended January 31, 1959, 1960, 1961 and 1962, the reasonable needs of the business of Rhombar required it to set aside and maintain a reserve at least equal to its entire net worth and to build-up such reserve out of its earnings and profits, as soon as feasible, to a minimum of at least $3,500,000 in order to finance an acquisition program (adopted in 1952 under circumstances more fully described below) of purchasing interests in businesses engaged in the manufacture of furniture and/or furniture manufacturing facilities. At no time during the years at issue had Rhombar accumulated sufficient amounts for this purpose.

Such statement also contained allegations of fact offered as a basis for the above grounds.

In the notice of deficiency, mailed on November 3, 1964, the respondent determined that the petitioner was liable for the accumulated earnings tax under section 531 of the Code for the taxable years ended January 31, 1959, 1960, 1961, and 1962, in the respective amounts of $26,670.28, $22,508.39, $18,237.96, and $20,856.56.

### OPINION

The first issue to be considered is whether assessment of any deficiency for the taxable year ended January 31, 1959, is barred by the statute of limitations. The petitioner has established that the notice of deficiency was mailed more than 3 years after the return for that year was filed and contends that, pursuant to the provisions of section 6501(a) of the Code, assessment is barred. The respondent contends that the notice of deficiency was timely, relying upon the 6-year period

of limitations provided by section 6501(e)(1)(A)[3] of the Code. He contends that the petitioner omitted from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return. Upon this issue the respondent has the burden of proof. *Edward F. Webber*, 21 T.C. 742, affd. (C.A. 10) 219 F. 2d 834; and *C. A. Reis*, 1 T.C. 9, affd. (C.A. 6) 142 F. 2d 900

The respondent contends that the amount of $67,500, representing the amount of due but unpaid installment obligations owing to the petitioner from John Stuart Inc., which the petitioner omitted from gross income, should properly have been reported as gross income for that year. It is his position that the amounts of such notes were constructively received in that year, citing section 1.451–2 of the Income Tax Regulations.[4] He argues, in effect, that John Stuart Inc. was able to pay the notes upon the maturity dates but that members of the Rothschild family, who controlled both the petitioner and John Stuart Inc., chose not to demand payment because they preferred that John Stuart Inc. should use its funds otherwise.

Section 44 of the Internal Revenue Code of 1939[5] provides that in the case of a sale on the installment plan there may be returned as income in any taxable year that proportion of the installment payments actually received in the taxable year which the gross profit realized or to be realized bears to the total contract price.

While we agree with the respondent that the circumstances here presented warrant special scrutiny to determine whether the petitioner

---

[3] Sec. 6501(e)(1)(A) of the Code provides in part:

GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *

[4] Sec. 1.451–2 of the Income Tax Regulations provides in part:

(a) *General rule.*—Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

[5] Sec. 44 of the Internal Revenue Code of 1939 provides:

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—In the case of (1) of a casual sale or other casual disposition of personal property * * * for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price * * * the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

constructively received the payments, it is our conclusion, after careful examination of the record, that it should not be considered that the amount of such notes was constructively received. We think that the nonpayment of the notes was based upon a valid business reason from the standpoint of both the obligor and the obligee. Despite the fact that the Rothschilds may have controlled both corporations, it appears that the corporations dealt with each other, at least insofar as these notes were concerned, on an arm's-length basis. The evidence shows that failure to pay the notes when due was attributable to the stringent cash position of John Stuart Inc. A plan was worked out, pursuant to the recommendation of the minority stock interest of John Stuart Inc., whereby the long-term debt owed to the petitioner, including the payments in arrears, was re-funded over an extended period. The petitioner, in consideration of its agreement to extend the time for payment, was to be paid interest upon the unpaid amounts, whereas under the old agreement no interest was payable. And it may be added that it does not appear that deferral of payment of the notes was prompted by a tax-avoidance motive on the part of the petitioner.

The respondent also contends that even if the payments be not considered as having been constructively received, they nevertheless should be considered as constituting gross income in the taxable year ended January 31, 1959, for the reason that they constitute proper accruals for that year. It is his position that although in 1954 he granted the petitioner's request to change from an accrual to the cash method of accounting, the petitioner remained on an accrual method with respect to these installment payments since the existence of the installment obligations had not been made known to the respondent in connection with the requested change of accounting method. Suffice it to say that the statute does not contemplate that the right to report income on the installment method is affected by the petitioner's basic method of reporting income (that is, accrual or cash method) or by a change from one method to another. Indeed, the respondent's regulations recognize that section 44 contains special provisions for reporting the profit derived from the sale of property on the installment plan. See sec. 39.41–2(d), Regs. 118.

In view of the foregoing, it is our conclusion that the amount of $67,500 did not constitute an omitted item of gross income within the contemplation of section 6501(e)(1)(A) of the Code, and it follows that the assessment of any deficiency for the taxable year ended January 31, 1959, is barred. In this connection it may be noted that the respondent also held that there had been omitted from gross income an amount of $16,926.54. It is his contention that this amount should be included in income as a compensating adjustment for a like amount which had been accrued and deducted in prior years, but which had

not actually been paid by the petitioner. We find it unnecessary to consider this question, since even if such amount were includable in gross income for the taxable year ended January 31, 1959, it would not constitute an omission in excess of 25 percent of the gross income of $70,357.26 stated by the petitioner in its return for that year.

The respondent also included in the petitioner's taxable income for the taxable year ended January 31, 1960, the amount of $45,000, representing installment obligations which became due in that year but were unpaid. For the reasons set forth above we hold that the respondent erred in including such amount in the petitioner's income for that year.

During the taxable years ended January 31, 1960, 1961, and 1962, the petitioner received payments on the notes in the respective amounts of $35,000, $35,000, and $100,000, which it reported as long-term capital gain. The respondent did not question such treatment with respect to five-sixths of the amounts received, since such portion represented the selling price of the petitioner's goodwill. The respondent determined that the remaining one-sixth of the amounts received in those years, namely, $5,833.33, $5,833.33, and $16,666.67, respectively (except to the extent of $35, $35, and $100, respectively), constituted ordinary income. The petitioner contends that the full amount received in payment of the notes constituted gain on the sale of property used in its trade or business and that therefore such gain should be considered as gain from the sale of capital assets held for more than 6 months, relying upon section 1231 of the Code.[6] The burden of proof in this respect is upon the petitioner.

One-sixth of the payments on the notes represented payments for the assets (other than goodwill) which were sold for $150,000. Such assets had, however, been valued by the petitioner at $210,006.45. This property was segregated into three categories: Office equipment and supplies at a valuation of $36,437.70; various accessories for showroom display at a valuation of $77,358.75; and leasehold improvements at a valuation of $96,210. In order to determine what proportion of the selling price of $150,000 is attributable to each category we deem it

---

[6] Sec. 1231 provides in part:

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales, [and] exchanges, * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

\* \* \* \* \* \* \*

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

proper in each case to multiply the selling price of $150,000 by a fraction the numerator of which is the valuation for the particular category and the denominator of which is the total valuation of $210,006.45. Thus the selling price of the office equipment and supplies was $26,026.13 (of which $127.85 was the selling price of the supplies); the selling price of the accessories for showroom display was $55,254.55; and the selling price of the leasehold improvements was $68,719.32.

From the description of the property in the schedule and the testimony with regard thereto we think it must be concluded that the office equipment constituted property subject to the allowance for depreciation and therefore constituted property used in the petitioner's trade or business within the meaning of section 1231 of the Code. The respondent concedes that such property was held by the petitioner for more than 6 months. The petitioner has not met its burden of showing that the supplies constituted property subject to the allowance for depreciation and hence has failed to show that the amount received therefor should be considered as constituting long-term capital gain.

We are also satisfied that the assets listed in the second category, namely, accessories for showroom display, constituted property subject to the allowance for depreciation. However, the petitioner has not shown that all such property was held for more than 6 months. Bearing against the petitioner which has the burden of proof, we have found that 75 percent in value of this property had been held by the petitioner for more than 6 months. See *Cohan* v. *Commissioner*, (C.A. 2) 39 F. 2d 540. Accordingly, we conclude that three-fourths of the gain upon the sale of such assets is to be treated as long-term capital gain under section 1231 of the Code.

We are also satisfied that the third category, namely, leasehold improvements, constituted property subject to the allowance for depreciation. Here again, however, we have found that the petitioner has not shown that more than 75 percent in value of the assets was held for more than 6 months. Accordingly, we hold that three-fourths of the gain from the sale of such assets is to be treated as long-term capital gain under section 1231.

The respondent's principal contention with respect to the above assets appears to be that the petitioner has not shown that they did not constitute inventory. However, we are satisfied that none of them constituted inventory, since the inventory was sold separately. Furthermore, we are satisfied from the record, including the testimony, that such assets were not held for sale to customers in the ordinary course of the petitioner's trade or business. The respondent also makes the contention that if they did not constitute inventory, the proceeds from the sale thereof should nevertheless be treated as ordinary income since, he contends, there has been no showing that the cost thereof had not been deducted as expense in prior years when the assets were

acquired, rather than being capitalized and depreciated. We see no merit to this argument. As stated, we are satisfied from the record that these assets, with the exception of the relatively small amount of supplies, constituted property subject to the allowance for depreciation and that they come within the class of assets contemplated by section 1231. If indeed the cost of such assets was deducted as an expense, the remedy would lie in correcting taxable income in the prior years by the disallowance of the claimed expense deductions and the allowance in lieu thereof of a reasonable amount on account of depreciation for the year of purchase and subsequent years, rather than by making a compensating adjustment in the year of sale.

The amount of the gain upon the sale of these three categories of assets which is to be treated as long-term capital gain will be computed in connection with the recomputation under Rule 50.

The remaining issue to be decided is whether petitioner is liable for the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954. Pertinent provisions of section 531 and other related sections are set forth in the margin.[7] Section 532

[7] SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax * * * .

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

(b) HOLDING OR INVESTMENT COMPANY.—The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders.

SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * *

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis hereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

of the Code provides that the accumulated earnings tax applies to a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533(a) provides that the fact that the earnings and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation shall prove to the contrary. Section 533(b) provides that the fact that a corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to the shareholders.

The respondent, pursuant to section 534(b), mailed a notification informing the petitioner that he proposed to send a notice of deficiency which would include an amount with respect to the accumulated earnings tax, and the petitioner, pursuant to section 534(c), submitted a statement of the grounds on which it relied to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business. The petitioner contends that the facts contained in such statement are sufficient to show the basis of such grounds and that, under the provisions of section 534(a)(2), the burden of proof is upon the respondent with respect to such grounds. The respondent, on the other hand, contends that the statement submitted by the petitioner was not adequate to shift the burden to the respondent, and that the petitioner has not shown that its earnings and profits were not permitted to accumulate beyond the reasonable needs of its business.

We find it unnecessary to resolve the question whether the earnings and profits of the petitioner were permitted to accumulate beyond the reasonable needs of its business within the contemplation of section 533(a), since we are of the opinion that the petitioner is liable for the accumulated earnings tax by reason of the provisions of section 533(b).

As stated, section 533(b) provides that the fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders. One of the contentions of the respondent is that the petitioner, in the years in question, was a mere holding or investment company. The petitioner, on brief, states that the respondent did not allege in his pleadings that the petitioner was a mere holding or investment company and that, therefore, that question is not properly before us. However, in the notice of deficiency the respondent determined that the petitioner was liable for the accumulated earnings tax, without specifying his reason for such determination. Under such deter-

mination we think it clear that the question of whether the petitioner was a mere holding or investment company is in issue. *Stanton Corporation*, 44 B.T.A. 56, affd. (C.A. 2) 138 F. 2d 512. See also *Helvering* v. *Gowran*, 302 U.S. 238, and *Brook* v. *Commissioner*, (C.A. 2) 360 F. 2d 1011. Furthermore, in his answer the respondent did put the petitioner on notice that he was relying upon the alternative ground that the petitioner was a mere holding or investment company.

Section 1.533–1(c) of the Income Tax Regulations provides:

A corporation having practically no activities except holding property and collecting the income therefrom or investing therein shall be considered a holding company within the meaning of section 533(b). If the activities further include, or consist substantially of, buying and selling stocks, securities, real estate, or other investment property (whether upon an outright or marginal basis) so that the income is derived not only from the investment yield but also from profits upon market fluctuations, the corporation shall be considered an investment company within the meaning of section 533(b).

The identical provision has appeared in all income tax regulations commencing with article 102–2 of Regulations 86, promulgated pursuant to the Revenue Act of 1934.

It is the position of the petitioner that it was not a *mere* holding or investment company. On brief it states that during the years in question it was accumulating its income for the purpose of acquiring furniture manufacturing facilities or interests therein for its own business purposes and that in those years its primary and major activity consisted of actively searching for, analyzing, and negotiating for the acquisition of furniture manufacturing businesses. Whether such activity, if proved, would justify the conclusion that the petitioner was not a mere holding or investment company, we find it unnecessary here to decide. It is clear, particularly in view of the provisions of section 533(b), that the petitioner has the burden of showing that it was not a mere holding or investment company, and it has not submitted evidence to show that it engaged in such alleged activities. It is the position of the petitioner that the summary of activities contained in its statement furnished pursuant to section 534(c) establishes that it was engaged in such activities. The facts alleged in statements submitted pursuant to section 534(c) are, in our opinion, to be considered only for the purpose of determining whether they are sufficient to show the basis for the grounds advanced in such statements on which the taxpayer relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business and, consequently, whether the respondent has the burden of proof, with respect to such grounds, in determining whether the earnings and profits have been permitted to so accumulate. Accordingly, we cannot accept the fact allegations in the petitioner's section 534(c) state-

ment as evidence in support of its burden of showing that it was not a mere holding or investment company.

On the record here presented it must be concluded that the petitioner has failed to show that it was not a mere holding or investment company. Indeed, such evidence as has been presented indicates that it was such. In 1952 it sold its business assets and thereafter its income, except for *de minimis* amounts, consisted of dividends, interest, capital gains from sales of securities, and payments on installment obligations received upon the disposition of its business assets. So far as the evidence shows its only activity in the years in question, aside from the mere holding of property and collecting income therefrom, consisted of purchasing and selling investment securities.

The evidence shows that the petitioner as of January 31, 1959, had accumulated earnings and profits in excess of $1,500,000, and that in the taxable years ended January 31, 1960, 1961, and 1962, it had substantial earnings and profits, with the result that its accumulated earnings and profits at January 31, 1962, were substantially in excess of $2 million. In such taxable years, and indeed for several years prior thereto, it paid an annual dividend of only $700. We must conclude, therefore, in view of the provisions of section 533(b), that the petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings to accumulate instead of being divided or distributed. It is therefore liable for the accumulated earnings tax, the amount of which will be computed in the recomputation under Rule 50.

*Decision will be entered under Rule 50.*