**BATTELSTEIN INVESTMENT COMPANY, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 67-H-670.**

United States District Court
S. D. Texas,
Houston Division.

Jan. 30, 1969.

Chamberlain & Hrdlicka, Robert I. White, Houston, Tex., for plaintiff.

Morton L. Susman, U. S. Atty., Houston, Tex., and Howard A. Weinberger, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., for defendant.

INGRAHAM, District Judge.

*Memorandum:*

This is an action to recover federal income taxes in the amount of $26,114.-72, plus interest, which were allegedly erroneously assessed and collected from the plaintiff, Battelstein Investment Company, for the fiscal years ending January 31, 1962, and January 31, 1963. The taxes involved are those imposed by Sections 531 through 537 of the Internal Revenue Code of 1954, 26 U.S.C. Secs. 531–537.[1] Plaintiff's timely filed claims for refund were disallowed by the District Director and it subsequently filed suit in this court for refund within the prescribed time limits.

The cause was tried to the court sitting without a jury and the parties have submitted briefs of the law. The case is now before the court for decision on the merits.

I.

In order to place the issues presented in their proper context, it is necessary

1. These provisions deal with the surtaxes imposed on corporations which unreasonably accumulate earnings and profits in order to avoid taxes at the shareholder level. Hereinafter all citations will be to the Internal Revenue Code of 1954.

to trace the history of the plaintiff corporation.

Plaintiff is the sister corporation[2] of Battelstein's, Inc., and was organized in 1929 for the purpose, inter alia, of owning and furnishing facilities to Battelstein's, Inc. During the period involved in this suit, Battelstein's, Inc. operated three large department stores in the Houston area.[3] The operating company was established in 1914 and it transacted its business in various rented facilities in downtown Houston until 1929. At that time the lease on the two-story Main Street building occupied by the operating company was on the verge of expiring. Because of the success the business had experienced in that location, Phillip Battelstein began negotiating with the owner of the leasehold (which then had ninety-one years to run) for the purchase of the leasehold and the building located thereon. It was finally agreed that Battelstein would purchase the leasehold and the building for $104,000, plus yearly rentals of $33,000. Upon advice of counsel, borrowed funds totaling $100,000 and personal funds were invested in the newly organized Battelstein Investment Company and title to the property was put into that company. Ben Battelstein, the current president of the operating company and an officer of the taxpayer, testified that his father decided to have the taxpayer acquire title to the property and assume the indebtedness because the operating company probably could not have borrowed such a large amount of money and because it was thought desirable, at any rate, to keep this long-term debt off the operating company's books so as to facilitate its arranging for inventory financing.

During the ensuing years the Battelstein companies reflected and shared in the rapid growth of the Houston area. Thus, in 1937 and 1938 the taxpayer took over the second floor of the building from the furrier who had formerly rented the space. In addition, it expended approximately $69,500 to remodel the first two floors and to add three new floors. All the funds expended by the plaintiff in the 1937–38 expansion were obtained through borrowing. At the same time, the operating company spent in the neighborhood of $90,000 to fixture all five stories of the Main Street building.

After the war it was decided that the operating company would have to open a suburban store if it were to retain its share of the Houston market. Accordingly, the taxpayer purchased a square block of land on South Main Street in 1946 for $128,959. Though the land carried restrictions at the time of its purchase which precluded its use for merchandising purposes until 1949 or 1950, the plan was that the taxpayer would build a new store on this property for the operating company as soon as feasible. The money used to buy the South Main property was borrowed. By 1952, however, it was determined that Houston's pattern of growth would be to the west rather than south down Main Street and hence no store was ever built on the South Main property. The land remained undeveloped until it was sold on the installment basis in 1962 for approximately $700,000.

In the meantime, after making a false start in 1946, in 1948 the taxpayer borrowed $750,000 from the Equitable Assurance Company and added five floors to the existing five floors of the Main Street building. The construction was completed in 1950 at a cost of $633,558.[4] The operating company occupied all ten floors of the building. At the insistence of Equitable, the rental charged the operating company by the

2. Sister corporations are two corporations having common or substantially common ownership by the same shareholders.

3. For convenience, Battelstein's, Inc. will be referred to as the "operating company" and Battelstein Investment Company will be denominated "the taxpayer" or, simply, "plaintiff".

4. The witness Ben Battelstein was unable to explain why $750,000 was borrowed and only $633,558 was actually spent.

plaintiff was adjusted upward to reflect the new space made available. Consistent with past practice, the operating company provided the fixtures for the five new floors. It also resorted to borrowed funds.

The next expansion occurred in 1953 when the operating company opened its first suburban store in the River Oaks area of Houston. The operating company negotiated a lease with the owners of an existing structure which required them to remodel the building. Incident to this expansion, the taxpayer borrowed an additional $283,000 from Equitable and installed the fixtures in the new store. The fixtures were then leased to the operating company.

In 1955 the Main Street store expanded into an adjacent building in order to gain an entrance on the street intersecting Main Street. Only a small part of the cost of this expansion was financed by the taxpayer, the greater portion being paid for by the landlord of the adjacent building. However, at this time the operating company spent in the area of $100,000 for new fixtures.

From 1955 to 1961 the Battelstein companies experienced a hiatus in their expansion. Though management apparently remained growth-minded, various factors combined to inhibit addition of any new stores. For example, plans to build a suburban store in Bellaire, Texas, (an incorporated city entirely surrounded by the City of Houston) were frustrated by a small group of citizens who feared that such a store would cause undue traffic problems. Likewise, inconclusive negotiations were had concerning expansion into the Meyerland and Northline shopping centers and the construction of a new store on Westheimer Road.

A second suburban store was finally opened in the Sharpstown Center in 1961. Because of Battelstein's strong bargaining position, the developer of Sharpstown provided the building and 100 percent financing of the fixtures at a low rate of interest. Consequently, the taxpayer was not called on to participate in this expansion.

In 1963 the taxpayer purchased the Crossroads Shopping Center from the Battelstein brothers for $266,972. Of the total consideration, $200,000 was derived from borrowing. It was never contemplated that a Battelstein's store would be placed in this center. The property was purchased purely and simply for investment purposes. Additional property contiguous to the Crossroads Center was purchased by the taxpayer in 1965 and 1968 at a cost of $22,111. Similarly, between 1964 and 1967 the taxpayer spent a total of $419,106 in an effort to "block up" a square block of downtown Houston real estate. This property was also purchased as an investment. There was no intent to utilize it as a location for a new store, rather management planned to build a high-rise apartment, office building or motel after they had purchased the entire block. Both the Crossroads and downtown properties produced rental income.

In 1966 and 1967 the taxpayer spent $90,829 on new, automatic elevators for the Main Street store. This modernization was financed without resort to borrowing.

During 1965 the Battelstein management initiated negotiations with the Rouse Company of Baltimore, Maryland, concerning the possibility of opening two new stores in the Almeda-Genoa and Northwest Shopping Centers. The negotiations became particularly active during the early part of 1967. At the same time, the Battelsteins were also engaged in exploring the possibility of opening a new store in the proposed Town & Country Center. Management intended to go into either Almeda-Genoa and Northwest or Town & Country, but not all three. No final commitment was made, however, since the operating company and the River Oaks fixtures owned by the taxpayer were sold to Manhattan Industries in October, 1967. The sale of the operating company was not anticipated during the two years involved in this litigation. In fact, the sale of

the business to Manhattan Industries was not seriously considered until mid-1967. At the present the only relationship between the taxpayer and the mercantile company is that the former is the landlord of the Main Street store.

II.

The initial inquiry is whether the taxpayer was justified in accumulating all, part or none of its earnings during the fiscal years ending January 31, 1962, and January 31, 1963, by reasonable business needs or reasonably anticipated business needs.[5] This presents a question of fact.[6] The court is mindful that in making this determination it must examine the facts as they existed during the period involved and that it must avoid the temptation to substitute its judgment for that of the taxpayer's officers and directors. Sterling Distributors, Inc. v. United States, 313 F.2d 803 (5 CA1963). Nevertheless, as stated by Mertens, "the court is not required to automatically accept the decisions of interested officers as the lodestone of reasonable need." Mertens, supra, at 69. The court's duty, then, is to scrutinize the testimony of the taxpayer's officers concerning their subjective intent and the objective manifestations of the same in order to satisfy itself that the two coincide. Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 241 F.2d 197, 202 (4 CA), cert. denied, 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957).

Stripped of obfuscation, plaintiff's argument is that its accumulation of earnings in the form of working capital was justified by four needs. They are:

(1) The need to replace its buildings, fixtures and equipment when and as they wore out;

(2) The need to provide for ordinary, day-to-day expenses;

(3) The need to retire the taxpayer's long-term debts;

(4) The need to provide funds to finance future expansion.

The court must now examine each of these alleged justifications individually in light of the fact that at the end of fiscal 1962 the plaintiff had accumulated earnings in the form of working capital totaling $137,558 and that at the end of the following fiscal year this had risen to $358,630. Equally important in this connection is that in the fiscal year ending in 1962, the ratio of current assets to current liabilities was 2.4:1. In the following fiscal year, the ratio was 3.1:1.

The argument with respect to the first justification is that the replacement cost of the taxpayer's assets was expected to significantly exceed their original cost. Consequently, plaintiff asserts, the accumulation of earnings was proper since it would be necessary to combine these funds with those derived from the depreciation allowance in order to cover the spread between original and replacement cost. In support of this contention, plaintiff relies principally on the decision in Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 274 F.2d 495 (4 CA), cert. denied, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 (1960).[7] While

5. During the 1962 fiscal year plaintiff accumulated earnings totaling $45,054.65. In 1963 the amount was $49,907.98. Since 1929 the total accumulation was $474,085.80 and $1,010,348.58 as of fiscal year 1962 and 1963 respectively. The $1,010,348.58 figure includes approximately $500,000 earned from the sale of the South Main property. See, supra, at 322.

6. Dickman Lumber Co. v. United States, 355 F.2d 670 (9 CA1966); Medical Arts Hospital v. Commissioner of Internal Revenue, 141 F.2d 404 (5 CA1944).

See also 7 Mertens, Law of Federal Income Taxation, Sec. 39.32 at 68 (1967 rev.).

7. The particular language relied on is: "Replacement of assets which are fully depreciated or depleted requires available cash but does not require a second appropriation of surplus. It is only when rehabilitation plans involve re-

plausible, the argument is bereft of support in the record and hence it must fail.

The evidence is clear that the only assets which the taxpayer had definite and specific plans to replace at the time in question were the fixtures in the River Oaks store. These fixtures have a depreciable basis of $266,320. As of January 31, 1963, the fixtures had a remaining useful life of four years and management estimated that it would cost approximately $250,000 to replace them. At the end of the 1963 fiscal year, the depreciation reserve for these fixtures totaled $183,799. The authorities hold that a taxpayer is not entitled to duplicate the depreciation allowance with accumulated earnings for the purpose of replacing assets. Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, supra, at 502–503. Thus, the only justifiable accumulation in this instance would be the difference between the total amount of depreciation recoverable and the higher replacement cost. Since the depreciable basis was over $266,000 and the estimated cost of replacement was $250,000, this difference may be nonexistent.[8] Furthermore, while there are statements in plaintiff's brief regarding higher replacement costs, not one iota of evidence was presented concerning how much the price of fixtures has risen since 1953. Finally, assuming that the price of fixtures has risen, the $137,558 which the taxpayer had in working capital at the close of the 1962 fiscal year was certainly more than enough to cover the spread between original and replacement cost. The court therefore concludes that none of the earnings accumulated during the two years in question can be justified on the basis of plaintiff's first argument.

The second argument in favor of the reasonableness of the accumulation, i. e., that it was necessary to provide for ordinary, day-to-day expenses, must also be rejected on the basis of the evidence. The evidence demonstrated without question that the taxpayer's expenses were of a highly predictable nature and that it had full insurance coverage. Generally, its expenses were limited to property and income taxes, payment of principal and interest on the corporation's debts, insurance premiums and rent on the Main Street leasehold. The plaintiff's income was equally predictable since the great majority of it was derived from rentals paid by its captive sister corporation. Of even greater significance in this regard is the fact that the taxpayer had no difficulty meeting its current obligations in 1962 and 1963 even though the operating company was delinquent in paying its rent during that period by as much as $224,000.[9] On the basis of the foregoing facts, the court finds that none of the earnings accumulated during fiscal 1962 and 1963 can be justified on the grounds that they were needed to provide for ordinary, day-to-day expenses. Cf. Motor Fuel Carriers, Inc. v. United States, 322 F.2d 576 (5 CA 1963); Barrow Mfg. Co. v. Commissioner of Internal Revenue, 294 F.2d 79 (5 CA 1961), cert. denied, 369 U.S. 817, 82 S.Ct. 827, 7 L.Ed.2d 783 (1962).

The third justification advanced by plaintiff in support of its accumulation of earnings is that this was necessary to enable it to retire its long-term debts. At the end of the 1962 fiscal year, the taxpayer's long-term debts totaled $255,000. By the end of the following year, they had risen to $365,000. As of January 31, 1962, long-term debts exceeded liquid assets by $117,442. By the following January, however, the excess of debts over assets had fallen to $6,370 due to the sale of the South Main property. An examination of the taxpayer's schedule of assets and liabilities makes

placement of old equipment with equipment costing more than the original, or when additional equipment is required, that appropriation of surplus is justified."
Id. 274 F.2d at 503.

8. The court assumes that the River Oaks fixtures had either no or very little salvage value.

9. See infra at 328–329.

it clear at the outset that the accumulation of earnings during the 1963 fiscal year cannot be justified on the basis of plaintiff's third contention. This is because at that time not only did the long-term note held as a result of the sale of the South Main land exceed the amount of long-term debt owed, but also the operating company was then indebted to the plaintiff for unpaid rentals due and owing in an amount that exceeded the total long-term debt by over $100,000.[10] With respect to fiscal 1962, though the issue is not as clear-cut, the answer must still be the same. The evidence showed that during the 1962 fiscal year, as in previous years, the taxpayer reduced its long-term debt by $50,000. These annual payments of $50,000 were made without impeding the steady growth of the plaintiff's net earnings.[11] All things considered, it is obvious to the court that plaintiff was in a strong financial condition in fiscal 1962 and that it could easily pay off its long-term obligations out of current earnings as each installment came due. The court thus concludes that the need to retire long-term debts provides insufficient justification for accumulating any earnings during the 1962 as well as the 1963 fiscal years.

The fourth and final justification advanced by the taxpayer in support of its contention that earnings were not unreasonably accumulated is that funds were needed to finance future expansion. The great bulk of the evidence adduced at the trial was directed toward sustaining this argument and it is this argument which presents the court with the closest question.

Briefly stated, plaintiff's position is that the operating company had a fixed policy of regular expansion in order to maintain its competitive position during the period in question. Plaintiff further contends that the taxpayer was always considered to be a "leaning post" for the operating company in the sense that the plan was for the taxpayer to accumulate its earnings so that it could provide the financial muscle when and as the operating company embarked on a new expansion project. The plaintiff emphasizes that the fixtures alone in each new store would cost between $500,000 and $600,000 and that a substantially greater investment would be required if the taxpayer were called on to supply the land and/or building in addition. Thus, accumulated earnings in the form of working capital as of January 31, 1962, and January 31, 1963, totaling $137,558 and $358,630, respectively, plaintiff concludes, must be held reasonable in view of the commitment to expansion and the high cost thereof.[12]

10. The figures as of January 31, 1963, were:

| | |
|---|---|
| Long-term debt owed: | $365,000 |
| Long-term note held: | $457,000 |
| Income due and not collected: | $474,448 |
| Total: | $931,448 |

11. During the period from 1952 to 1962, the plaintiff's net earnings increased to $44,927 from $26,292.

12. The taxpayer's position in this regard is exemplified by a resolution which was unanimously adopted by its Board of Directors on February 13, 1964. It should be noted, however, that the resolution was drafted at a time when a controversy with the Internal Revenue Service regarding the imposition of the accumulated earnings surtax was anticipated. The resolution states:

"WHEREAS, the City of Houston is growing at a very steady rate; and

"WHEREAS, Battelstein's, Inc. will have to expand its business in order to participate in such growing population

In the proper circumstances, no doubt, a business may accumulate its earnings with impunity over a period of years in order to finance contemplated future expansion. Both the cases and the regulations so provide.[13] It is equally clear, though, that the expansion plans must be specific and definite.[14] Moreover, not only must the plans be specific and definite, but also they must be manifested by a contemporaneous course of conduct.[15]

Without retracing the evidence discussed heretofore, it must be obvious that the Battelstein companies experienced a pattern of steady, if unspectacular, growth from 1929 to 1967.[16] Expansion projects were considered repeatedly throughout this period. But—and this is the important factor—the evidence did not show that the taxpayer had any definite and specific plans for expansion during the critical period, i. e., the fiscal years ending on January 31,

and maintain its relative position in the community; and

"WHEREAS, more particularly, it is expected that within the next five (5) years, there will be a substantial population growth in the Clear Lake area, the eastern part of Harris County, Texas, where the NASA and Humble Oil Company industrial developments are now taking place and Battelstein's, Inc. will undoubtedly be required to locate a store in such area; and

"WHEREAS, competitors of Battelstein's, Inc. have already obtained locations in such area in anticipation of the area's growth (more particularly Federated Department Stores); and

"WHEREAS, upon the expansion by Battelstein's, Inc. of its business, it is expected that favorable investment opportunities will be presented to this company in any one or more of the following forms (i) the purchase of land and the construction of a store building for leasing to Battelstein's, Inc., (ii) the purchase of fixtures and leasing and renting of the same to Battelstein's, Inc., (iii) the purchase by Battelstein's, Inc. of existing properties and the sale of the same to this company and the lease-back by this company of the same to Battelstein's, Inc.; and

"WHEREAS, the above anticipated investment opportunities will require substantial capital on the part of this company in order to take advantage of the same—

"*BE IT RESOLVED:* That no dividend be declared on stock of this company at this time in order to conserve the cash and cash equivalent position of the company to take advantage of anticipated investment opportunities;

"*BE IT FURTHER RESOLVED:* That the Board of Directors recognize that prudent management dictates the investment of the company's funds to produce income, provided that such investment should be temporary and short term in nature and readily convertible into cash so that funds so invested may be made available when opportunities to the company are presented."

13. See, e. g., Henry Van Hummell, Inc., v. Commissioner of Internal Revenue, 364 F.2d 746 (10 C.A.1966), cert. denied, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (1967); Sterling Distributors, Inc. v. United States, 313 F.2d 803 (5 C.A. 1963).

Treas.Regs.Secs. 1.537-1(b); 1.537-2 (b) (1).

See also Mertens, supra, Sec. 39.38.

14. See, e. g., Mead's Bakery, Inc., v. Commissioner of Internal Revenue, 364 F.2d 101 (5 C.A.1966); Carlen Realty Co. v. Tomlinson, 345 F.2d 998 (5 C.A.1965); Young Motor Co. v. Commissioner of Internal Revenue, 339 F.2d 481 (1 C.A. 1964); Barrow Mfg. Co. v. Commissioner of Internal Revenue, 294 F.2d 79 (5 C.A. 1961), cert. denied, 369 U.S. 817, 82 S.Ct. 827, 7 L.Ed.2d 783 (1962).

15. See, e. g., Henry Van Hummell, Inc. v. Commissioner of Internal Revenue, supra, n. 13; Dixie, Inc. v. Commissioner of Internal Revenue, 277 F.2d 526 (2 C.A.), cert. denied, 364 U.S. 827, 81 S.Ct. 62, 5 L.Ed.2d 54 (1960); I. A. Dress Co. v. Commissioner of Internal Revenue, 273 F.2d 543 (2 C.A.), cert. denied, 362 U.S. 976, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960); Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 241 F.2d 197 (4 C.A.), cert. denied, 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957).

16. See supra at 322.

1962, and January 31, 1963.[17] This absence of definite and specific plans during the two years involved in this litigation is crucial, for, as stated by Mertens:

> "In order to determine whether profits were accumulated for the reasonable needs of the business or to avoid the surtax upon shareholders, the controlling intention of the taxpayer is that which is manifested at the time of the accumulation, not subsequently declared intentions which are merely the products of afterthought."

Mertens, supra, at 85. Ben Battelstein testified that during the two years in question there were no plans for expansion, that no traffic or feasibility studies were made and that no architect was consulted.[18]

In this factual setting the court is compelled to conclude that the accumulation of earnings during the 1962 and 1963 fiscal years cannot be justified on the basis of the supposed need to provide funds for future expansion. The taxpayer's plans were simply too nebulous.

An additional relevant factor in this connection is that every expansion undertaken by the taxpayer since its inception was financed by borrowing. The court does not mean to imply that once a taxpayer adopts a certain method of financing, it must adhere to that method forever. Nevertheless, this taxpayer's history of debt financing does, to some extent, debilitate its argument that earnings had to be accumulated to finance expansion. Cf. Motor Fuel Carriers, Inc. v. United States, 202 F.Supp. 497 (N.D. Fla.1962), vacated and remanded on other grounds, 322 F.2d 576 (5 CA 1963).

Finally, the regulations [19] set out five factors which, though neither conclusive nor exclusive, if existent, may be indicative of an unreasonable accumulation. Three of the five factors apply to the instant taxpayer. Thus, Section 1.537–2 (c) (1) provides that loans to shareholders may be indicia of an unreasonable accumulation. The evidence showed that in fiscal 1963 the three controlling shareholders (Abe, Harry and Ben Battelstein) each borrowed $15,000 from the plaintiff. Again, in fiscal 1964, the Battelstein brothers borrowed a total of $125,000 from plaintiff. In both cases, the borrowed money was used by the brothers to pay for their individual stock purchases.

Section 1.537–2(c) (3) provides:

> "Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the

17. The expansion projects considered by the taxpayer between 1957 and 1968 can be summarized as follows:

| Fiscal Year Ending | Project |
|---|---|
| 1–31–57 | Bellaire |
| 1–31–58 | |
| 1–31–59 | Meyerland; Northline; Westheimer Rd. |
| 1–31–60 | Sharpstown |
| 1–31–61 | |
| 1–31–62 | |
| 1–31–63 | |
| 1–31–64 | |
| 1–31–65 | |
| 1–31–66 | Almeda-Genoa; Northwest |
| 1–31–67 | " " " |
| 1–31–68 | Town & Country |

18. The failure to consult with an architect during the critical period is significant in light of Ben Battelstein's testimony that: "We wouldn't build a doghouse without an architect."

19. Treas.Regs. Sec. 1.537–2(c).

shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations;"

shall be an indication of an unreasonable accumulation. The plaintiff admitted that at the end of the 1962 fiscal year, it accrued rentals owed by the operating company in the amount of $223,561. At the close of the following fiscal year, the amount of unpaid rentals was $165,000. In terms of economic realities, these deferred rentals were nothing more than unsecured, interest-free loans to the operating company. There can be no doubt, however, that substantially the same shareholders owned and controlled both the operating company and the taxpayer.

Section 1.537–2(c) (4) of the same regulations teaches that:

"Investment in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation;"

may be evidence of an unreasonable accumulation of earnings. On January 31, 1963, the taxpayer owned a $125,000 certificate of deposit and $27,000 worth of marketable securities. In subsequent years the amount invested in such securities multiplied several times. The court has previously had occasion to note that the taxpayer spent a considerable amount of money for the Crossroads Center and the Caroline Street property though it had no intention of locating a new Battelstein's store on either.[20]

In summary, after considering all the evidence, the court finds as a matter of fact that the plaintiff did not have reasonable business needs or reasonably anticipated business needs for accumulating any of its earnings during the two years in question. The conclusion that all of the earnings were unreasonably accumulated is based both on the failure of plaintiff's justifications to withstand the test of the evidence and on the existence of other indicias of unreasonable accumulation.

III.

The determination that earnings were unreasonably accumulated in the 1962 and 1963 fiscal years is not dispositive. The ultimate question in deciding whether the tax imposed by Section 531 is applicable is whether the corporation was formed or availed of for the purpose of permitting its earnings and profits to accumulate in order that the shareholders might avoid the taxes which they otherwise would have to pay if dividends had been distributed. Mertens, supra, Sec. 39.47a. Under Section 533(a), a finding that earnings were unreasonably accumulated raises a rebuttable presumption that the corporation was indeed formed or availed of for the purpose of avoiding taxation at the shareholder level. Mertens, supra, Sec. 39.29 at 54–56. In short, as a result of the court's finding, the plaintiff is faced with the task of proving a negative, i. e., that the proscribed purpose did not exist.

One additional preliminary issue must be resolved, however, before the court may direct its attention to the ultimate inquiry. This issue is whether plaintiff was a "mere holding or investment company" (as that phrase is defined) during the fiscal years involved in this suit. A resolution of this issue is required by Section 533(b) which provides:

"The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders."[21]

20. See supra at p. 323. The total consideration paid for the two pieces of property was $708,189. This figure represents a significant percentage of the approximately two million dollars spent by the taxpayer on all capital assets since its inception.

21. Under Section 535(c) (3) an affirmative resolution of the mere holding company issue would also limit the taxpayer to an accumulated earnings credit of no more than $100,000. Since the instant taxpayer had accumulated earnings prior to the two years in question well in ex-

The Treasury Regulations define holding and investment companies in the following terms:

> "A corporation having practically no activities except holding property and collecting the income therefrom or investing therein shall be considered a holding company within the meaning of section 533(b). If the activities further include, or consist substantially of, buying and selling stocks, securities, real estate, or other investment property (whether upon an outright or marginal basis) so that the income is derived not only from the investment yield but also from profits upon market fluctuations, the corporation shall be considered an investment company within the meaning of section 533(b)."

Treas.Regs. Sec. 1.533–1(c).

The adjective "mere" which is used in Section 533(b) in connection with holding and investment companies must not be overlooked. It was inserted in the statute to distinguish those corporations whose nature is such as to create the presumption of the proscribed purpose from those which are primarily holding or investment companies. A corporation is not affected by Section 533(b) even though it is primarily a holding or investment company. Industrial Bankers Securities Corp. v. Higgins, 104 F.2d 177 (2 CA 1939); Olin Corporation v. Commissioner, 42 B.T.A. 1203, 1214 (1940), aff'd, 128 F.2d 185 (7 CA 1942).

After reviewing the taxpayer's activities since its inception, the court is of the opinion that it cannot properly be classified as a "mere holding or investment company". The role played by the taxpayer in expanding and modernizing its properties was sufficient to remove it from that category. Cf. Turner v. Commissioner, 34 P–H Tax Ct.Mem. 598 (1965). Of course, the fact that a corporation is not a "mere holding or investment company" does not preclude a finding that it was formed or availed of for the purpose of escaping income taxes at the stockholder level. Almours Securities, Inc. v. Commissioner, 35 B.T.A. 61 (1936), aff'd, 91 F.2d 427 (5 CA 1937), cert. denied, 302 U.S. 765, 58 S.Ct. 476, 82 L.Ed. 594 (1938).

## IV.

This brings the court to the final and pivotal issue in this lawsuit, viz., whether plaintiff was formed or availed of for the purpose of permitting its stockholders to avoid the taxes which they would have had to pay had dividends been distributed. The issue is factual rather than legal.[22]

Before discussing the issue in detail, two points should be clarified. First, as a consequence of the court's conclusion that earnings were unreasonably accumulated, and by virtue of Section 533(a), the plaintiff has the burden of rebutting the presumption that the taxpayer was formed or availed of to avoid shareholder taxes. But, plaintiff is not in the position of having to overcome a prima facie case. Second, the evidence does not show, nor does the government contend, that plaintiff was formed for the proscribed purpose. The only question, then, legitimately before the court is whether the taxpayer was availed of for the purpose of avoiding taxes at the shareholder level.

Before the Supreme Court's recent decision in United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (January 13, 1969), the Courts of Appeals were divided on the question of whether tax avoidance had to be the "dominant purpose" behind a corpora-

cess of $100,000 (see n. 5 supra), such an affirmative resolution would deny plaintiff any additional credit.

22. American Metal Products Corp. v. Commissioner of Internal Revenue, 287 F.2d 860 (8 C.A.1961); Kerr-Cochran, Inc. v. Commissioner of Internal Revenue, 253 F.2d 121 (8 C.A.1958), and cases cited therein at 124; Egan, Inc. v. Commissioner of Internal Revenue, 236 F.2d 343 (8 C.A.1956); Medical Arts Hospital v. Commissioner of Internal Revenue, 141 F.2d 404 (5 C.A.1944).

tion's accumulation of earnings in order to render it liable for the surtax imposed by Section 531.[23] As a result of the decision in Donruss, it is now clear that a corporation is liable for the surtax avoidance with respect to stockholders was one of the purposes behind the accumulation of earnings. Id. 393 U.S. at 299–302, 89 S.Ct. 502–504.

A review of the evidence adduced at the trial convinces the court that plaintiff has not rebutted the presumption that it was availed of for the proscribed purpose. In fact, the court is of the opinion that the evidence established that the desire to avoid shareholder taxes was one of the purposes of the accumulation. This conclusion is based on several considerations.

First, the regulations[24] set out three circumstances which, though neither conclusive nor exclusive, may be construed as evidence of the purpose to avoid shareholder taxes. They are: (1) Loans to stockholders; (2) Investment by the corporation in unrelated assets; and (3) the corporation's prior dividend history. In discussing the reasonableness of the accumulation, the court has heretofore noted the existence of loans to the stockholders and investment in unrelated assets. See supra at 328–329. The evidence also showed that the first dividend ever paid by the taxpayer was in fiscal 1965. And, by the admission of plaintiff's own witnesses, a dividend was declared in that year only because of a 1964 amendment to the Internal Revenue Code changing the definition of a personal holding company. The fact that the payment of a dividend in 1965 was motivated by tax considerations is very significant when it is remembered that at that time plaintiff was negotiating with the Rouse Company concerning the possibility of adding two new stores.

Second, the authorities teach that the fact that the stockholders have saved large amounts of income taxes as a result of the corporate accumulation is important in determining whether the surtax should be applied. See Mertens, supra, Sec. 39.49 and cases cited therein at n. 63. The evidence established that the three Battelstein brothers were in over the fifty percent tax bracket. More important, the evidence showed that if a $30,000 per year dividend had been declared during each of the two years involved, the approximately $50,000 attributable to the Battelstein brothers would have entailed almost $32,000 in additional income taxes between the three of them. The figures speak for themselves.

Finally, the evidence demonstrated that although the Battelstein brothers were able and experienced business executives, they were paid only approximately $900 in salaries by the taxpayer during the two years in question. The payment of low salaries to employees who are also controlling stockholders is another indication of the existence of the purpose to avail of the corporation in order to avoid shareholder taxes. Cf. Young Motor Co. v. Commissioner of Internal Revenue, 339 F.2d 481 (1 CA 1964); Factories Investment Corp. v. Commissioner of Internal Revenue, 328 F.2d 781 (2 CA 1964).

It is the opinion of the court that judgment should be entered for the defendant. The clerk will notify counsel to draft and submit judgment accordingly.

23. See cases discussed in United States v. Donruss Co., supra, at n. 1.

24. Treas.Regs.Sec. 1.533-1(a)(2).