H. C. COCKRELL WAREHOUSE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7260–76.    Filed March 26, 1979.

*Carle E. Davis* and *Joseph C. Wool, Jr.,* for the petitioner. *John C. McDougal,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income tax of $6,974.78 and $6,521.81 for the respective taxable years ending June 30, 1972, and June 30, 1973. Some adjustments determined by respondent have not been contested. The central issue before us is whether under section 532(a), I.R.C. 1954,[1] petitioner was formed or availed of during the fiscal years 1972 and 1973 for the purpose of avoiding the income tax with respect to its shareholder.

## FINDINGS OF FACT

Some facts have been stipulated and are so found.

H. C. Cockrell Warehouse Corp. was organized under the laws of Virginia on February 5, 1957. The principal office of petition-

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise indicated.

er during 1971, 1972, and 1973 was in Richmond, Va. Since its incorporation, petitioner has engaged principally in the leasing of warehouses.

Petitioner filed income tax returns for fiscal years ended June 30, 1972, and June 30, 1973, with the Internal Revenue Service Center, Memphis, Tenn.

Petitioner's sole shareholder, H. C. Cockrell, Sr., owned the stock of four corporations, including petitioner, which were engaged in various aspects of the warehouse business. Two of the corporations, Virginia Bonded Warehouse Corp. and H. C. Cockrell Bonded Storage Co., Inc. (hereinafter Cockrell Bonded Storage), were "operating" companies primarily engaged in the warehousing and shipping business, which included receiving, storing, and shipping freight for their customers. The two other corporations, Associated Warehouse, Inc., and petitioner, were primarily engaged in owning the warehouse properties and leasing them to the "operating" companies. Thus, Associated Warehouse leased the warehouses to Virginia Bonded Warehouse and petitioner leased its warehouses to Cockrell Bonded Storage.

During 1971, 1972, and 1973, H. C. Cockrell was president and a director of petitioner; H. Clarke Cockrell, Jr., was vice president and a director; and Sarah R. Magri was secretary-treasurer and a director. These three individuals were also the directors of Virginia Bonded Warehouse, Cockrell Bonded Storage, and Associated Warehouse.

Petitioner owned five warehouses during fiscal years 1972 and 1973, all of which were leased to Cockrell Bonded Storage at a total annual rental of $66,000. Under the lease agreement, Cockrell Bonded Storage, as lessee, paid the expenses of maintaining the warehouses, such as repairs and insurance. Petitioner paid the real estate taxes on the warehouses and land.

Petitioner's warehouses are the type in which space is rented to a number of users. Its warehouses are not bonded warehouses.

Four of petitioner's warehouses were in existence at the time of its incorporation in 1957. The newest warehouse was built by petitioner in 1960. Since its incorporation in 1957, the only improvements petitioner has made to its buildings (aside from repairs made by Cockrell Bonded Storage) have been two fire doors installed in 1959 and 1963 at a total cost of $915, a sprinkler system installed in one warehouse in 1961 at a cost of $7,500, and an office added in 1968 costing $4,060.62.

During 1969, petitioner had considered constructing a warehouse in Charlotte, N.C. The correspondence between H. C. Cockrell and the Seaboard Coastline Railroad and a Charlotte construction company concerning this proposal was signed by or addressed to Cockrell as president of either Virginia Bonded Warehouse or Cockrell Bonded Storage. However, one of H. C. Cockrell's letters indicated that his discussions regarding this property were on behalf of petitioner.

By 1972, petitioner's warehouses had deteriorated to the point where some walls were cracking, the roofs were leaking, the loading docks were in poor condition, and some floors were settling.

Because of the condition of the warehouses, customers of Cockrell Bonded Storage complained orally to H. C. Cockrell and in writing to Cockrell Bonded Storage, and the Food and Drug Administration issued a warning to Cockrell Bonded Storage criticizing the condition of the buildings.

As a result of the complaints, H. C. Cockrell spent considerable time surveying the problems with Cockrell Bonded Storage customers, and also supervising repairs. The repairs were the responsibility of and paid for by Cockrell Bonded Storage. Petitioner did not expend any funds on alterations to the warehouses subsequent to 1968.

Because of the complaints made to Cockrell Bonded Storage by its customers and the Food and Drug Administration, petitioner, at some unspecified time, began to consider the possibility of renovating its warehouses by adding aluminum siding to all buildings and by making major repairs to the roofs and floors. In the fall of 1972 or early 1973, petitioner obtained from Bass Construction Co. a cost estimate for the renovations of about $200,000. Other than obtaining this cost estimate petitioner took no action with respect to the renovation it had considered. The minutes of the board of directors' and stockholder's meetings contained no mention of plans to renovate, and no major alterations to petitioner's warehouses were ever made.

Upon petitioner's receipt of the cost estimate from Bass Construction Co., it became apparent that the renovations under consideration would be too expensive to be warranted in view of the age and general condition of the buildings. Petitioner thus had abandoned the prospect of renovating as of February or March 1973.

Two customers of Cockrell Bonded Storage, Sears Roebuck and Armstrong Rubber Co., stored tires in warehouse space leased to them by Cockrell Bonded Storage. In the spring of 1973, Sears and Armstrong contacted H. C. Cockrell about their need for additional storage space. The five warehouses leased by Cockrell Bonded Storage from petitioner, which had a total of 150,000 square feet, were not large enough to fill the additional requirements of Sears and Armstrong. Accordingly, H. C. Cockrell began looking for a site for the construction of a warehouse large enough to accommodate the increased Sears and Armstrong accounts.

Had any such new warehouse been built, it would have been leased by Cockrell Bonded Storage to Sears, Armstrong, and the other customers of Cockrell Bonded Storage.

One potential site considered by H. C. Cockrell was located near the McGuire Hospital in Richmond, Va. In the spring of 1973, Cockrell contacted Aubrey Bass of Bass Construction Co. to determine if the McGuire property was suitable for the construction of a warehouse.

During the spring of 1973, H. C. Cockrell had meetings and telephone conversations with Bass concerning the feasibility of constructing a warehouse on the McGuire property. In addition, Bass Construction Co. drew preliminary plans to see if the contemplated warehouse would fit on the property. The type of warehouse under consideration required sufficient space on either side to accommodate railroad tracks on one side and access for trucks on the other. The preliminary plans drawn by Bass Construction Co. were not detailed plans, but merely involved locating the proposed structure on the property to determine whether its construction on the McGuire tract was feasible.

H. C. Cockrell also had meetings and telephone conversations with representatives of a railroad company concerning a spur track that would have to be added to the property to give the warehouse access to the railroad. The railroad prepared a survey of the property that was necessary to determine if the spur track could be constructed on the parcel in a proper relation to the proposed building.

The plans prepared by Bass Construction Co. and the survey done by the railroad revealed that an easement for a power line right-of-way on one side of the McGuire property would interfere with the proposed use of the land.

As a result of the preliminary drawings and railroad survey, H. C. Cockrell determined that it was not economically feasible to build a warehouse on the McGuire property.

Sometime in the summer of 1973, right after the prospect of using the McGuire property had been abandoned, H. C. Cockrell was contacted by James Gregory, a representative of the Seaboard Coastline Railroad, which was trying to develop commercial property that would be serviced by the railroad. Gregory showed Cockrell a parcel of property in Chesterfield County, Va., which Cockrell considered might be appropriate for the construction of a new warehouse to accommodate the increased Sears and Armstrong storage. In late September, the railroad advised H. C. Cockrell that it had tentatively priced the parcel at approximately $100,000.

As he had done in connection with the McGuire property, H. C. Cockrell met with Bass and railroad representatives, and had preliminary plans drawn to determine whether the property was suitable for the proposed use. Additionally, in this instance, Cockrell obtained from Bass Construction Co. a tentative cost estimate for a 250,000 square foot warehouse of $6 per square foot, or approximately $1,500,000.

An additional $500,000 would have been required to complete the railroad sidings, which would have been constructed by the railroad, and the sprinkler and lighting systems, which would have been built by the corporation that would have owned the warehouse. When one of H. C. Cockrell's corporations built a new warehouse, it was customary for Cockrell to handle the arrangements for these aspects of the project himself.

The preliminary plans drawn by Bass Construction Co. were labeled "Virginia Bonded Warehouses Corporation." As far as Bass was concerned, it was preparing the plans for H. C. Cockrell. When Bass Construction Co. built a warehouse for Cockrell, Bass had no idea what corporation was to own the property until the first bill was sent, when it contacted Cockrell to find out the proper addressee.

On October 2, 1973, James Gregory wrote a letter to Cockrell confirming that the parcel he was considering had been tentatively priced by the railroad at approximately $100,000. This letter was addressed to Cockrell as president of Virginia Bonded Warehouse.

On January 22, 1974, H. K. Daugherty of Armstrong wrote a

letter addressed to H. C. Cockrell as president of Virginia Bonded Warehouse, expressing his pleasure that Cockrell was still energetically pursuing the possibilities of a new facility to handle Armstrong's account, advising that Armstrong was greatly interested in the prospects of a new warehouse facility, and requesting the preliminary cost estimates so that he could formulate an outline of his company's requirements and approximate a target date for the facility's completion.

On January 29, 1974, H. C. Cockrell wrote Daugherty a letter that began, "Thank you very kindly for your letter of January 22nd advising that there is a great possibility that Armstrong would increase activity through our facilities if we decided to go along with our new building program." The letter went on to provide information on the proposed site location and cost estimates, to describe the attractive features of the proposed facility, and to request assurances from Armstrong as to the storage fees and volume before his business committed itself to the project. The letter was signed by H. C. Cockrell as president of Virginia Bonded Warehouse.

In 1974, the national energy shortage rendered the tire market uncertain, and Armstrong and Sears were unable to guarantee that the business they provided Cockrell Bonded Storage would increase.

The proposed warehouse at the Seaboard site was never constructed.

After the energy problem subsided, H. C. Cockrell resumed discussions with Sears and Armstrong regarding the possibility of providing them increased storage space for tires.

Sometime in 1975, Cockrell Bonded Storage acquired a group of warehouses adjacent to Interstate 95, known as the Larus property, which it used to accommodate the Sears and Armstrong accounts. The Larus property was purchased by Cockrell Bonded Storage for $1,400,000, $300,000 of which was paid in cash. A note was given for the balance, secured by a first deed of trust on the property.

In late 1972 or early 1973, when it became apparent that it was not possible to modernize petitioner's existing warehouse facilities, H. C. Cockrell began planning to liquidate petitioner. Petitioner was in fact liquidated in 1976 or 1977.

Petitioner has never paid a dividend. During fiscal years 1972 and 1973, dividends were not discussed in recorded directors'

meetings and the decision whether to pay dividends was left to petitioner's accountants.

During fiscal years 1972 and 1973, petitioner owned a dwelling in Virginia Beach, Va., and a hunting lodge in Charles City County, Va., both of which were leased to H. C. Cockrell at an annual rental of $3,000. Petitioner incurred the following expenses with respect to these properties:

|  | Fiscal year 1972 | Fiscal year 1973 |
| --- | --- | --- |
| Depreciation | $2,681.64 | $3,009.81 |
| Utilities | 570.02 | 957.17 |
| Real estate tax | 682.02 | 699.45 |
| Repairs | 883.98 | 1,796.27 |

The Virginia Beach and Charles City County properties were used by H. C. Cockrell as vacation property and as places to entertain employees of the operating companies at his expense.

During fiscal years 1972 and 1973, petitioner did not maintain a separate office, but shared an office space with H. C. Cockrell's other corporations. The extent of petitioner's separate physical facilities was a filing cabinet. Petitioner also had no salaried employees, did not advertise, and had no telephone.

The minutes of petitioner's stockholder's and board of directors' meetings reveal no activity other than election of directors and officers.

Aside from depreciation, the expenses of petitioner's owning and leasing warehouses during the fiscal years in issue consisted of taxes, legal and audit expenses, and a small amount of interest.

Petitioner's secretary-treasurer, Sarah Magri, paid the bills, kept the books of account, and attended board meetings.

Petitioner's books of account consisted of one book containing cash receipts and disbursement pages and general ledger pages. Approximately 10 pages (perhaps more, including the general ledger) contained entries for the fiscal years in issue. Receipts included the monthly rent from Cockrell Bonded Storage, entries which were required approximately seven or eight times a year, and rent from H. C. Cockrell on the Virginia Beach residence and Charles City County hunting lodge, which was recorded at the end of the year. Disbursements included four pages of entries for taxes, lights, repairs, and other expenses at the beach

house, expenses of the hunting lodge, and auditors' expense. Additional entries were the yearend closing entries.

Sarah Magri attended one board meeting annually where minutes were kept. Although she participated in several other meetings of the directors from day to day, the same people were directors in the other corporations as well.

No capital additions or improvements were made to petitioner's facilities after 1968.

In response to questions by a revenue agent of respondent about employment taxes during the examination of petitioner's returns in 1974, Sarah Magri repeatedly stated that no one performed any duties for the petitioner other than her duties as bookkeeper. H. C. Cockrell also stated to the revenue agent that he performed no duties for the petitioner.

For the fiscal years 1972 and 1973, petitioner's taxable income was $42,364.45 and $40,799.40, respectively.

Exclusive of the accumulated earnings tax, petitioner's Federal income tax liabilities for the fiscal years 1972 and 1973 were $17,001.61 and $17,083.71, respectively.

Petitioner's accumulated earnings as of June 30, 1971, and June 30, 1972, were $280,030.07 and $297,941.87, respectively.

Respondent, pursuant to section 534(b), sent by certified mail on January 21, 1976, a notification informing petitioner that a proposed statutory notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531 for the fiscal years ending June 30, 1972, and June 30, 1973.

Petitioner, pursuant to section 534(c), timely submitted to respondent on March 19, 1976, an adequate statement of grounds upon which it relied to establish that all or part of its earnings and profits for the fiscal years ending June 30, 1972, and June 30, 1973, had not been permitted to accumulate beyond the reasonable needs of its business. In said statement, petitioner listed the following alleged grounds: (1) Repair and modernization of petitioner's warehouse facilities; and (2) construction of a new warehouse facility at Bellwood Road in Chesterfield, Va.

On May 19, 1976, respondent sent to petitioner by certified mail a statutory notice of deficiencies that included amounts with respect to the accumulated earnings tax imposed by section 531 for the fiscal years ending June 30, 1972, and June 30, 1973. The explanation of the accumulated earnings tax adjustment on Schedule 2 of the notice of deficiency stated as follows:

It is determined that you were formed or availed of for the purpose of avoiding income tax with respect to your shareholders by permitting earnings and profits to accumulate instead of being divided or distributed during the taxable years ending 6–30–72 and 6–30–73. Accordingly, the accumulated earnings tax provided by section 531 of the Internal Revenue Code of 1954 is being asserted for the taxable years ending 6–30–72 and 6–30–73.

In determining your accumulated earnings credit under the provisions of section 535 of the Internal Revenue Code, consideration was given to the statement dated March 19, 1976, filed by you in response to the notification sent to you on January 21, 1976. It is determined that the information set forth in your statement is not sufficient to establish that any part of your earnings and profits for the taxable years ending 6–30–72 and 6–30–73 was retained for the reasonable needs of your business. Accordingly, the minimum accumulated earnings credit has been allowed, computed as shown in Schedule # 3.

## ULTIMATE FINDINGS OF FACT

During fiscal years 1972 and 1973, petitioner was a mere holding company.

During fiscal years 1972 and 1973, petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholder by permitting earnings and profits to accumulate instead of being divided or distributed.

## OPINION

The ultimate issue is whether for either or both of the tax years ending June 30, 1972, and June 30, 1973, petitioner was "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation by permitting earnings and profits to accumulate instead of being divided or distributed." Sec. 532(a). If it was so formed or availed of, petitioner is subject to the accumulated earnings tax. Secs. 532(a), 531. For these purposes, "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Sec. 533(a). Also, "The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders." Sec. 533(b).

Respondent contends that the rebuttable presumptions under section 533 apply here on the ground that petitioner was a mere holding or investment company and that it accumulated earn-

ings beyond the reasonable needs of its business. Respondent concedes that under the procedures outlined in section 534 petitioner has shifted to respondent the burden of proving that the two grounds cited in petitioner's section 534(c) statement were not reasonable business needs to justify the accumulation of petitioner's earnings and profits.

In his opening statement, petitioner's counsel asserted that respondent was raising a new issue in arguing petitioner was a "mere holding company" in that such argument was not raised in the statutory notice of deficiency. Accordingly, petitioner's counsel asked that the Court hold that the burden of proof on this point also is on respondent. In his brief, petitioner's counsel goes further and argues the issue is not before the Court.

We believe petitioner's procedural argument is answered in *Rhombar Co. v. Commissioner*, 47 T.C. 75 (1966), affd. 386 F.2d 510 (2d Cir. 1967). There we held that the determination by respondent in the statutory notice of deficiency that the accumulated earnings tax was applicable, without specifying the reason therefor, put the question of whether the taxpayer was a mere holding or investment company in issue. 47 T.C. 90, 91. Here the notice of deficiency adopted the general language of section 532, stating:

> It is determined that you were formed or availed of for the purpose of avoiding the income tax with respect to your shareholders by permitting earnings and profits to accumulate instead of being divided and distributed during the taxable years ending 6–30–72 and 6–30–73. Accordingly, the accumulated earnings tax provided by section 531 of the Internal Revenue Code of 1954 is being asserted for the taxable years ending 6–30–72 and 6–30–73.

The notice of deficiency did not specify the reason for such determination.

The next paragraph in the statutory notice of deficiency (set forth in our findings of fact) simply responded to the section 534(b) statement of grounds on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. We believe it cannot fairly be said, as petitioner asserts, that this paragraph narrowed the scope of respondent's general determination in the preceding paragraph of the statutory notice of deficiency. The section 533(b) question therefore is in issue, and petitioner bears its usual burden of proving that during its 1972 and 1973 fiscal years it was more than a mere

holding company. Rule 142(a), Tax Court Rules of Practice and Procedure.

Turning now to the substantive aspects of these issues, we consider first respondent's principal position: That under section 533(b), petitioner was a mere holding company and that this is prima facie evidence of the purpose to avoid the income tax with respect to shareholders. According to section 1.533–1(c), Income Tax Regs., a holding company is "A corporation having practically no activities except holding property and collecting the income therefrom or investing therein."

The record leaves little doubt but that petitioner was primarily a holding company. Petitioner's normal activity was owning the warehouse properties and leasing them to its sister operating company, Cockrell Bonded Storage. The operating company paid all the expenses of maintaining the facilities, such as repairs and insurance, so that petitioner had no responsibility for managing its properties. We do not regard the minor activity of petitioner in paying some expenses with respect to the vacation properties it leased to H. C. Cockrell as business activities. These expenses related to property used for the sole shareholder's personal benefit. Furthermore, after construction of its last warehouse in 1960, petitioner made few improvements to its facilities, and after 1968, no improvements to its facilities were made. These facts, together with the absence of management responsibilities with respect to the warehouses and the lack of salaried employees, suggest that over the years petitioner had practically no activities except holding property and collecting the income therefrom—that is, it was a holding company under the regulations.

Yet a corporation can be primarily a holding company but not a "mere" holding company within the meaning of section 533(b). A distinction has been drawn between holding corporations that are strictly passive in nature and those that engage in "some measure of business activity." *Dahlem Foundation, Inc. v. Commissioner*, 54 T.C. 1566, 1567 (1970). In *Dahlem Foundation, Inc.* these activities were sufficient to avoid mere holding company status: (1) Locating an undeveloped parcel of real estate for a shopping center; (2) negotiating and paying the purchase price of such undeveloped land; (3) securing leases for occupancy of the buildings to be situated in the shopping center; (4) arranging a loan for construction of the shopping center; (5) various man-

agement functions with respect to the center; and (6) maintaining and repairing various portions of the center. The taxpayer also actively managed other properties.

Of more direct interest here is *Battelstein Investment Co. v. United States,* 302 F. Supp. 320 (S.D. Tex. 1969), affd. without discussion of this issue 442 F.2d 87 (5th Cir. 1971), cited with approval in *Dahlem Foundation, Inc.* In *Battelstein Investment Co.,* the taxpayer owned and furnished facilities to its sister operating corporation engaged in a retail mercantile business. From 1937 to 1967, but not during the 1962 and 1963 fiscal years in issue, the taxpayer expended funds in expanding and modernizing its properties. The taxpayer's "role" in expanding and modernizing its properties was found sufficient to remove it from the mere holding or investment company category.

Although in *Battelstein Investment Co.* and other cases[2] only a modest degree of business activity was found sufficient to overcome mere holding company status, petitioner's lack of activity compels a finding that it was a mere holding company. During fiscal years 1972 and 1973, petitioner did little other than receive rent and pay taxes, legal and audit fees, and utilities and repairs of the dwelling and hunting lodge.

Petitioner argues two principal activities as showing that it was not a mere holding company. First, petitioner asserts that during fiscal year 1972 it planned major renovations to its existing warehouses. However, H. C. Cockrell testified that the renovations were only contemplated and that the only action actually taken was the obtaining of a cost estimate. Since the proposal was abandoned immediately upon learning how much it would cost, such "planning" could hardly constitute sufficient business activity to remove petitioner from "mere holding company" status.

Petitioner also asserts that it was not a mere holding company because of its planning to construct a new warehouse. Compare *Battelstein Investment Co. v. United States, supra.* In making this argument, petitioner claims H. C. Cockrell's activities in

---

[2]See also *Nemours Corp. v. Commissioner,* 38 T.C. 585 (1962), affd. per curiam 325 F.2d 559 (3d Cir. 1963) (although taxpayer had been a personal holding company for the 22 preceding years, during the taxable year it at least purchased a working interest, including managerial rights, in 18 gas condensate wells; the wells were operated by taxpayer's agent, but the gradual assumption of management and operation responsibilities were planned by the taxpayer during the taxable year and actually carried out over the next 2 years).

investigating the feasibility of two construction sites should be attributed to petitioner.

The record is ambiguous regarding which corporation, if any, can be regarded as planning construction of the new warehouse. As was customary when one of H. C. Cockrell's corporations built a new warehouse, Cockrell handled the arrangements himself. When Bass Construction Co. planned or worked on a warehouse for one of H. C. Cockrell's corporations, as far as Bass was concerned, it was doing so for H. C. Cockrell until he decided which corporation would be billed. However, here the proposed warehouses were never constructed and Bass billed no one. Furthermore, only the McGuire site was being considered during fiscal 1973 and this was abandoned quickly. The Seaboard site did not come into the picture until after the close of fiscal 1973. Taking this together with the fact that Cockrell Bonded Storage, not petitioner, acquired the needed warehouse in 1975, the record will not support a finding that petitioner planned the warehouse construction.

Indeed, apart from H. C. Cockrell's hindsight testimony that he was acting on behalf of petitioner, the record better supports a contrary finding that his actions in this regard were on behalf of Cockrell Bonded Storage, rather than petitioner. As already noted, Cockrell Bonded Storage ultimately acquired the needed facilities in 1975. On brief, counsel for petitioner asserts that the petitioner did not acquire the property because it could not produce cash to meet the $300,000 downpayment required. We have found, however, that in late 1972 or early 1973, when it became apparent that it was not possible to modernize petitioner's existing warehouse facilities, H. C. Cockrell began planning to liquidate petitioner, which liquidation was carried out in 1976 or 1977. That fact strongly supports respondent's contention that the proposals to construct or acquire a new warehouse were being considered on behalf of Cockrell Bonded Storage and not petitioner.[3]

Viewing the record as a whole, we conclude that during fiscal years 1972 and 1973 petitioner had no meaningful business activity beyond the holding of property and collection of income. We

---

[3]In response to questions by a revenue agent about employment taxes, H. C. Cockrell and Sarah Magri, petitioner's bookkeeper, made statements to the effect that H. C. Cockrell performed no duties for petitioner. These statements are inconsistent with petitioner's position here, but we give them little weight.

have found that petitioner was a mere holding company during the years in issue, and that fact constitutes prima facie evidence of the purpose to avoid income tax with respect to petitioner's shareholder.

Since petitioner has produced no evidence of any purpose for its accumulation of earnings and profits other than testimony about modernization and expansion plans, we also have found that petitioner was availed of for the purpose of evading the income tax on its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. This moots consideration of respondent's secondary argument that petitioner accumulated earnings beyond the reasonable needs of its business.[4]

We add parenthetically, however, that the record supports respondent's argument that the two reasons given by petitioner for accumulating income, i.e., the renovation of its existing warehouses and the construction of a new one, were not realistic business needs that would justify the accumulation of petitioner's earnings and profits. Both of these projects were nebulous. The only activities relative thereto during the years involved were investigation; no serious action was taken by petitioner. We are convinced that petitioner would not have taken any steps to renovate its properties or construct new ones that would have called for an expenditure in excess of its earnings and profits accumulated prior to fiscal 1972.

*Decision will be entered for the respondent.*

---

[4]Petitioner made an additional argument that the accumulated earnings credit would eliminate accumulated earnings tax liability if its current earnings and profits retained for the reasonable needs of the business were sufficient. Petitioner acknowledged, however, that this argument would apply only if petitioner were found not to be a mere holding company. See sec. 535(c).