POWDER MILL REALTY TRUST, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Powder Mill Realty Trust v. Commissioner
Docket No. 2955-71.
United States Tax Court
T.C. Memo 1973-149; 1973 Tax Ct. Memo LEXIS 137; 32 T.C.M. (CCH) 707; T.C.M. (RIA) 73149; July 9, 1973, Filed Herbert S. Urbach and Edward D. Grayson, for the petitioner. Robert B. Dugan, for the respondent. Raum
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in petitioner's tax as follows: Taxable year
Income tax
Accumulated earnings
Total ending March 31
(sec. 531) tax
1966
$ -0-
$10,533.92
$10,533.92
1967
844.80
12,130.08
12,974.88
1968
(865.79)
12,607.98
11,742.19
*139 2 The only issue remaining for decision is whether petitioner was availed of during the foregoing taxable years for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. FINDINGS OF FACT The parties have stipulated to certain facts and exhibits which are incorporated herein by this reference. Petitioner is a "Massachusetts Realty Trust". As more fully described hereinafter, it was organized in 1957 for the purpose of holding real estate that was to be used for the administrative and operational facilities of H. H. Scott, Inc. ("HHS"), a prominent manufacturer and marketer of high fidelity stereophonic and sound measuring equipment. Petitioner has been treated as a corporation for Federal income tax purposes, and its Federal corporate income tax returns for each of its taxable years ending March 31, 1966, 1967 and 1968, respectively, were filed with the district director of internal revenue at Boston, Massachusetts. At the time its petition herein was filed, petitioner's principal office was in Maynard, Massachusetts. The principal technical expert of HHS, and *140 its chief executive officer for a number of years as well as one of its 3 principal shareholders, was Hermon Hosmer Scott ("Scott"). Scott received bachelor's and master's degrees in electrical engineering from the Massachusetts Institute of Technology, and his professional career in engineering has been one of unusual accomplishment. HHS was organized in 1947, eventually attaining a position of pre-eminence in the field of electronics. During the period from April 1, 1965 through March 31, 1968, the outstanding capital stock of HHS was held as follows: Stockholder
Number of
Percentage Shares
H. H. Scott
2,969
29.74
Victor H. Pomper
2,202
22.06
John Gillingham
31
.31
E. G. Dyett, Jr.
293
2.94
James Casey
26
.26
Daniel von Ricklinghausen
400
4.01
Priscilla W. Scott
8
.08
Jane A. Scott
8
.08
Robert Rines
44
.44
Myron T. Smith, Trustee
4,000
40.08
9,981
100.00
Priscilla W. Scott and Jane A. Scott were the daughters of H. H. Scott. Myron T. Smith held his 4,000 shares in HHS as the trustee of five trusts of which five members of the Scott family (H. H. Scott, his wife Eleanor, Priscilla, Jane and H. H. Scott's brother, *141 Charles) were beneficiaries. 4 HHS has never held any real estate in its own name. Prior to 1957, the company's operations were carried on in rented quarters in a building located in Cambridge, Massachusetts. HHS grew rapidly during the 1950's, taking over additional space in the Cambridge building from time to time and eventually expanding beyond the limits that the facility could allow. Scott and Victor H. Pomper, the vice-president and a shareholder of HHS and its president at the time of trial herein, undertook a search of the area surrounding Boston for land suitable for the erection of a new plant for the company. At a meeting held on November 13, 1956, Scott and Pomper reported to the HHS shareholders that the best location they had found was one on Powder Mill Road in Maynard, Massachusetts, but that the corporation's own resources were inadequate to finance the proposed building, that loans would be difficult to obtain, and that some form of additional investment by someone closely associated with HHS was a likely course of action. Scott and Pomper had also been advised by counsel of the availability of tax advantages in Massachusetts if the real estate were isolated *142 from the corporation. The shareholders thus resolved as follows: 5 * * * That the Directors be empowered to negotiate with Hermon H. Scott to establish a real estate trust with funds provided by himself and/or his wife, Eleanor B. Scott, said trust to construct a building in Maynard particularly for the use of the Corporation, and that said Directors are hereby instructed and authorized to negotiate a lease with said real estate trust covering the rental of the building for a period of twenty years at a rental not to exceed One Dollar and Seventy Five Cents ($1.75) per square foot per year. * * * That under the terms of said lease the Corporation would pay taxes, insurance, heat, legal fees, and all additional expenses associated with the construction and occupancy of said new building other than mortgage interest. * * * That the Corporation would provide any necessary guarantees in addition to the personal guarantees of Hermon H. Scott and Victor H. Pomper which might be necessary in addition to said lease in order to secure the proper financing for said building. * * * That the new realty trust apply to the Second Bank-State Street Trust Company for a first mortgage *143 on the proposed building and to the Massachusetts Business Development Corporation for a second mortgage on said building. Pursuant to the foregoing resolution, petitioner was organized under a declaration of trust executed on January 8, 1957, by Scott, his wife Eleanor, and Pomper, as trustees. At all relevant times, Scott has held 51 of petitioner's 100 outstanding beneficial shares, and Eleanor has owned the remaining 49 shares. 6 Petitioner acquired the parcel of land in Maynard that had been recommended to HHS by Scott and Pomper (the "Powder Mill property"), and on June 13, 1957, Scott, Eleanor and Pomper, in their respective capacities as trustees of petitioner, and Scott, as president and treasurer of HHS, executed an indenture providing, in relevant part, as follows: I. DESCRIPTION OF LEASED PREMISES. The LESSOR [petitioner] leases to the LESSEE [HHS] the following premises: About ten acres of land with the buildings to be erected thereon on Route 62, Maynard, Massachusetts, subject to existing easements, party wall agreements, Zoning Laws, and rights and encumbrances of record. II TERM. TO HAVE AND TO HOLD (unless sooner terminated as herein provided) *144 for the term of fifteen years beginning with the first day of July, 1957, provided, however, that the LESSEE may extend the term of this lease for five (5) years from July 1, 1972, by giving notice to the LESSOR on or before January 2, 1972. III. ORDINARY RENT. YIELDING AND PAYING therefor rent at the rate of FORTY THOUSAND DOLLARS ($40,000) yearly in equal monthly payments of THREE THOUSAND THREE HUNDRED THIRTY-THREE DOLLARS AND THIRTY-THREE CENTS ($3,333.33) in advance the first day of each month, for the month beginning with that day, and at that rate, such payments to be made at such place as the LESSOR may in writing direct. IV. ADDITIONAL RENT. The LESSEE shall also pay as additional rent all the taxes, insurance premiums and assessments whatever which may be assessed upon or payable in respect to said premises or any part thereof during said term for a period wholly or partly within said term * * *. V. CONSTRUCTION OF PLANT. The LESSOR agrees forthwith to construct, equip and complete a plant on said premises in accordance with the plans and specifications by Smith and Sellew, Architects, and with supplemental plans and specifications previously submitted to the *145 LESSEE. 7 In accordance with the terms of the foregoing agreement, a single-story building of approximately 32,000 square feet was erected upon the Powder Mill property to house the entire manufacturing, engineering, administrative and marketing facilities of HHS, which were transferred to Maynard from Cambridge in 1957. Construction costs amounted to approximately $200,000, of which approximately $150,000 was obtained under a first mortgage from a commercial bank. The remaining funds were secured from the Massachusetts Business Development Corporation, under a second mortgage, and the Scott family. Air conditioning units were installed on the roof of the building during petitioner's fiscal year ending March 31, 1960, at a cost of $7,000-$8,000. Those improvements were financed solely by petitioner's accumulated earnings. The business of HHS continued to expand rapidly, and a need for additional space became apparent sometime after 1960. A second building, of approximately 74,000 square feet, was then erected upon the Powder Mill property. That facility was completed and occupied by HHS in the fall of 1964; prior thereto the corporation fulfilled its additional needs *146 by leasing space elsewhere in Maynard. On September 3, 1963, an indenture representing a supplementary lease to cover the new premises was entered into between petitioner and HHS. That instrument provided that as of September 1, 1964, the aggregate annual rent payable by HHS would be increased to $132,500. 8 In order to build the new structure on a level with the original building, as was desired, substantial excavation of the steeply graded construction site was undertaken. Additional land was also partially flattened - at a level considerably higher than that at which the new building was to be erected -, to accommodate an approximately four-acre parking area. The aggregate construction costs relating to the new building, including those of excavation, amounted to approximately $571,000, of which approximately $460,000 related solely to the structure itself. The bulk of the financing for the project was obtained under a mortgage from a commercial bank, with approximately $111,000 of the aggregate borrowings being charged directly to HHS. The amounts charged to HHS were used to finance leasehold improvements related to the new building which were the responsibility of *147 the lessee. No more than $40,000 of the financing came out of petitioner's accumulated earnings, although its earned surplus at the end of its fiscal year during which work on the new building was completed amounted to over $125,000. HHS continued to grow steadily after 1964, and it soon required even more space, primarily for storage purposes. Although warehouses facilities could be rented in the Maynard vicinity on inexpensive terms - and some such space was in fact rented by HHS for short periods of time after 1964 -, 9 it was felt that the difficulties of carrying on a multi-plant operation necessitated further development of the Powder Mill property. In early 1966 the plant manager of HHS estimated that approximately 30,000 square feet of warehouse space and approximately 100,000 square feet of manufacturing space would be needed by 1969 or 1970, with 10,000 square feet of warehouse space being required at once. An HHS employee was put in charge of the warehouse project, and he solicited bids on a 30,000 square foot structure. Scott and Pomper were told, however, that it was possible to erect a 10,000 square foot building to which additions could easily be made at *148 a later time and that little or no extra expenses would be incurred by postponing the additional work. They concluded that a facility accommodating only HHS" immediate storage needs would be built forthwith and that construction of an additional warehouse would be put off for two or three years. It was hoped that a contractor might be found during that period who would have a need for land fill and thus be willing to do the excavation for the proposed second warehouse at no cost to either petitioner or HHS. In connection with the excavation for the 10,000 square foot structure, it was found not to be economically feasible to bring the building site down to a level even with that of the two existing buildings and that it would suffice to even the land out on a plane approximately 20 feet above the floors of those buildings. 10 Scott and Pomper secured a building permit for the proposed warehouse and other permits necessary for the removal of the fill preliminary to its construction, and during petitioner's fiscal year ending March 31, 1967, a facility of 9,600 square feet was built on a site adjacent to, and higher than, the parking area that had been created when the second *149 building had been erected. The new warehouse was of a prefabricated steel character - in contrast to the more permanent type of construction of the two older buildings -, and was therefore erected quickly and inexpensively. Various structural components of the building were designed to make it readily amenable to future expansion. The warehouse was connected to the original buildings by a passageway on an inclined plane housing a conveyor. Upon completion of the new facility, HHS" annual rent was increased by $10,560. Total construction costs, including less than $5,000 for excavation, amounted to $66,071.72, all of which came out of petitioner's current and accumulated profits. At the time Scott and Pomper were planning the 9,600 square foot warehouse, they were told by their contractor that an additional 20,000 square foot facility would cost from $120,000 to $130,000, exclusive of excavation costs, with some possible inflation of those figures if construction were postponed for a few years. 11 Late in the calendar year 1966, when work on the 9,600 square foot warehouse had been substantially completed, Pomper was urged by the new plant manager of HHS to begin planning *150 for the construction of the additional 20,000 square foot storage facility, which was felt to be needed within the next two or three years, and also to consider the erection or acquisition of a 100,000 square foot combined manufacturing and warehouse facility. Nothing in the record suggests that petitioner's trustees or the directors or officers of HHS gave any thought to the erection of a 100,000 square foot building that would be funded by petitioner, but in early 1967 HHS representatives were instructed to enter into negotiations in respect of the second warehouse proposed for the Powder Mill property. HHS personnel thereupon began to make various preliminary inquiries in respect of construction of the new facility. The contractor that had built the original warehouse was asked to reconfirm his $120,000-$130,000 estimate for a new 20,000 square foot structure, which he did. Officials of the town of Maynard who were responsible for overseeing different aspects of the proposed construction were contacted by an HHS maintenance employee, who was a Maynard resident, and informed of HHS" developing plans for the new building. In order to avoid excavation costs of $20,000-$25,000 *151 in connection with the project, efforts were made to locate a contractor that would 12 remove the fill at no charge, and Scott and Pomper sought to obtain the necessary permits for that work from the town of Maynard. Scott and Pomper received no compensation from petitioner at any time for any of the rather considerable activities they engaged in on its behalf; the other HHS employees who worked on various Powder Mill projects likewise received no separate compensation from petitioner. However, the annual rents paid to petitioner by HHS were adjusted to reflect the fact that HHS employees sometimes performed services for petitioner. Petitioner had no employees, and it paid no compensation to its officers. The initial application for excavation permits was denied in 1967, because the Maynard authorities were not satisfied that the removal of fill would not result in excessive water drainage from the Powder Mill property onto abutting land. So great was their concern that permits to remove the fill for the construction of a 20,000 square foot facility were not granted until the summer or fall of 1969, although the processing of such permits ordinarily took only about six to *152 eight weeks. Thereafter, the authorized work was enjoined by court order in December of 1969 pursuant to the petition of a local citizen. Petitioner and HHS had encountered similar citizen resistance to some of the earlier excavation, and Pomper, in his capacity as president of HHS, submitted a written statement to the appellate board citing the favorable effects such work had had 13 on the drainage problem. The appeal was successful, the injunction was lifted early in 1970, and a contractor that had by then been located proceeded to remove the fill for the new warehouse. (Two earlier attempts to have the fill removed had been made in 1967 and 1968, respectively, but the contractors had been unwilling or unable to complete the job.) After the fill was removed, certain improvements costing $4,000-$5,000 were made in the water sprinkler system of the other Powder Mill buildings in order to provide service to the new warehouse. Such improvements were made pursuant to the suggestion of the insurer of the Powder Mill facilities. HHS had meanwhile rented additional warehouse space on a temporary basis. The proposed new warehouse, however, has never been built. By mid-1970, HHS *153 had found itself undergoing a severe economic reversal, and by the time of the trial herein the corporation was on the verge of bankruptcy. No further work was performed on the site of the proposed new warehouse after mid-1970, and that site has not been used since. In 1971 approximately 8,000 unneeded square feet of the 74,000 square foot building were leased to an unrelated party. In its fiscal year ending March 31, 1965 and in following years, petitioner loaned substantial amounts to HHS. Nothing in the record indicates that HHS paid any interest on such indebtedness. The following table shows the transactions in the loan accounts through March 31, 1968: 14 Date
Transaction
Regular
ImprovementAc
Total Account
count
8-64
Improvements charged to
$ 97,723.42
HHS
12-10-64
Repayment
$ (10,000)
12-23-64
Loan
10,000
1-9-65
Loan
23,000
2-1-65
Loan
8,000
2-65
Improvements charged to
13,734.23
HHS
3-31-65
BALANCE
$31,000
$111,457.65
$142,457.65
5-20-65
Loan
$ 20,000
7-1-65
Laon
12,700
7-28-65
Loan
6,000
3-31-66
BALANCE
69,700
$111,457.65
$181,157.65
5-2-66
Loan
$ 20,000
10-13-66
Repayment
(20,000)
12-13-66
Repayment
(10,000)
2-14-67
Loan
25,000
3-31-67
BALANCE
$84,700
$111,457.65
$196,157.65
5-4-67
Loan
$ 26,000
7-3-67
Loan
8,000
8-1-67
Loan
8,000
9-1-67
Repayment
(15,000)
11-8-67
Loan
8,000
12-5-67
Loan
9,000
1-3-68
Loan
9,000
2-9-68
Loan
8,000
3-4-68
Loan
8,000
3-31-68
BALANCE
$153,700
$111,457.65
$265,157.65
*154 All transactions in the regular account were effected by bank checks. The two charges to the improvement account represented the portion of the mortgage loan taken out by petitioner in connection with the construction of the 74,000 square foot building (completed during the fall of 1964) that was used to finance leasehold improvements and charged directly to HHS. 15 At the times the foregoing loans were made, Scott and Pomper, as petitioner's trustees, regarded HHS as a sound repository for petitioner's earnings until such times as funds might be needed for improvements upon the Powder Mill property. Thus, the aggregate repayments of $30,000 during petitioner's fiscal year ending March 31, 1967, were used to defray part of the cost of the 9,600 square foot warehouse that was built during that year. None of the loans outstanding as of March 31, 1968, was ever repaid, however. In its taxable year ending March 31, 1970, petitioner wrote off the bulk of its accounts receivable from HHS, leaving on its books a balance of only $111,457.65 (apparently the remaining balance in the "improvement account"). In or about February of 1971, HHS" remaining indebtedness to petitioner *155 was converted into HHS stock. Petitioner's balance sheets at the close of its taxable years ending March 31, 1965-1968, respectively, showed the following: 16 Taxable year ending March 31
1965
1966
1967
1968 Assets: Cash
$ 15,031.74
$ 31,015.75
$ 9,273.02
$ 3,276.27
Notes & accounts
142,457.65
181,157.65
196,157.65
265,157.65
receivable
Other investments
540.00
540.00
---
---
(deposits)
Buildings & other
665,911.81
665,911.81
731,983.53
731,983.53
fixed depreciable
assets
Accumulated
(122,279.21)
(165,769.82)
(207.983.57)
(249,903.57)
amortization &
depreciation
Land
12,500.00
12,500.00
13,040.00
13,040.00
$714,161.99
$725,355.39
$742,470.63
$763,553.88
Liabilities &
Capital:
Accounts payable
$ 4,588.00
---
---
---
Mortgages, notes, &
38,870.03
$ 30,327.41
$ 31,860.42
$ 38,078.77
bonds payable in less
than 1 yrs.
Other current
6,500.00
8,000.00
8,000.00
8,500.00
liabilities (real
estate taxes)
Mortgages, notes,
532,529.42
501,924.34
469,731.20
434,045.91
bonds payable in 1
yr. or more
Other liabilities
---
---
1,760.00
---
(prepaid rental
income)
Retained earnings -
125,674.54
179,103.64
225,119.01
276,929.20
unappropriated
$714,161.99
$725,355.39
$742,470.63
$763,553.88
*156 17 From its first fiscal year of operations, ending March 31, 1958, through its taxable year ending March 31, 1970, petitioner's gross income was derived exclusively from the rents it received from HHS, with the exception only of incidental amounts of interest income. It sustained no net operating losses until its taxable year ending March 31, 1970, and it had never made a dividend distribution as of the end of that year. Its after-tax earnings were thus accumulated, and it did not indicate on its tax returns that any such accumulations were appropriated to any specific purpose. The following table portrays the growth in petitioner's accumulated earnings account, as adjusted to reflect certain changes made by the Commissioner for the fiscal years 1967 and 1968 and agreed to by petitioner: Taxable year
Taxable Income
Net Federal
Accumulated
Increase over
ending March 31
income taxes
earnings as of
prior year
paid
year end
1958
$ 9,910.33
-0-
$ 9,910.33
9,910.33
1959
13,614.79
$ 2,973.10
20,552.02
10,641.69
1960
15,733.85
4,084.44
32,201.43
11,649.41
1961
21,173.99
4,720.16
[1] 53,456.86
21,255.43
1962
22,874.10
6,352.20
69,978.76
16,521.90
1963
25,937.42
6,862.23
89,053.95
19,0 75.19
1964
20,573.39
7,985.92
101,641.42
12,587.47
1965
29,795.92
5,762.80
125,674.54
24,033.12
1966
61,303.68
7,874.58
179,103.64
53,429.10
1967
70,701.14
22,925.77
226,879.01
47,775.37
1968
76,641.94
26,591.75
276,929.20
50,050.19
1969
79,431.23
31,906.98
[1] 324,449.89
47,520.69
1970
(174,890.63)
34,789.69
114,769.57
(209,680.32)
*157 18 Petitioner's earnings were allowed to accumulate partly because Scott was extremely hostile to lending institutions and greatly preferred to finance improvements on the Powder Mill property out of petitioner's own funds rather than through debt. If petitioner had distributed its current earnings for each of its taxable years ending March 31, 1966, 1967 and 1968, respectively, the income tax liability of Scott and his wife would have been increased as follows: Taxable
Increase Year
1966
$20,827
1967
24,581
1968
27,762
On or about September 18, 1970, the Commissioner notified petitioner by certified mail that he proposed to issue a notice of deficiency for the taxable years here in issue which would include amounts in respect of the accumulated earnings tax imposed by section 531 of the 1954 Code. Petitioner timely submitted a statement (incorporated herein by reference) purporting to comply with section 534(c) of the Code. The Commissioner then mailed to petitioner a deficiency *158 notice dated January 29, 1971, wherein he determined that petitioner was formed or availed of for the purpose of avoiding the income tax with respect to your shareholders by permitting earnings and profits to accumulate instead of being divided or distributed during the taxable years ended March 31, 1966, March 31, 1967 and March 31, 1968.Accordingly, the accumulated earnings tax provided for under Sections 531 and 532 of the Internal Revenue Code of 1954 is being asserted for each of the taxable years ended March 31, 1966, March 31, 1967 and March 31, 1968. 19 OPINION RAUM, Judge: The sole remaining issue is whether petitioner is liable for the accumulated earnings tax imposed by sections 531 and 532(a) of the 1954 Code on "every corporation * * * availed of for the purpose of avoiding the income tax with respect to its shareholders * * *, by permitting earnings and profits to accumulate instead of being divided or distributed." [2] 20 Under section 533 of the Code, [3] rebuttable presumptions of the existence of the prohibited purpose to avoid the income tax are erected if it is found that earnings and profits have been permitted to accumulate *159 beyond the reasonable needs of the business (section 533(a)) or that a corporation was a "mere holding or investment company" (section 533(b)).[4] Section 21 534 [5] establishes procedure whereby the burden of proof with respect to certain elements of an issue under section 533(a) may be shifted to the Government in proceedings before this Court. The ultimate burden of proving that the corporation was not availed of for the prohibited statutory purpose remains, however, upon the petitioner, irrespective of the 22 effect of section 534. Commissioner v. Young Motor Company, 316 F. 2d 267, 270-272 (C.A. 1), reversing a Memorandum Opinion of this Court; Wellman Operating Corporation, 33 T.C. 162, 182; see Sandy Estate Co., 43 T.C. 361, 374, footnote 6, acq. 1965-1 C.B. 4. *160 The Commissioner contends that petitioner has not met the conditions of section 534 whereby it might have shifted a limited burden of proof to the Government, that in any event the weight of the evidence calls for the application of both of the presumptions provided for by section 533, and that petitioner has failed to rebut either of those presumptions and is therefore liable for the accumulated earnings tax. We hold that the Commissioner must prevail, but only because petitioner has not overcome the presumption created by section 533(a), which we find to be operative even assuming that the Commissioner had the burden of proving all or some of the facts necessary to establish that presumption.Cf. Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79, 82 (C.A. 5), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817; American Metal Products Corporation v. Commissioner, 287 F. 2d 860, 861-862 (C.A. 8), affirming 34 T.C. 89; Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, 504 (C.A. 4), affirming a 23 Memorandum Opinion of this Court, certiorari denied 362 U.S. 976, *161 rehearing denied 363 U.S. 832; Wellman Operating Corporation, supra, 33 T.C. 162, 183. We therefore find it unnecessary to decide whether the section 533(b) presumption against a "mere holding or investment company" is also applicable. Cf. Helvering v. Stock Yards Co., 318 U.S. 693, 698; Rhombar Co. v. Commissioner, 386 F. 2d 510, 513 (C.A. 2), affirming 47 T.C. 75; Novelart Manufacturing Co., 52 T.C. 794, 805, affirmed 434 F. 2d 1011 (C.A. 6), certiorari denied 403 U.S. 918. 1. Unreasonable accumulation as evidence of purpose to avoid income tax. - (a) Burden of proof. Although we are of the view that the weight of the evidence establishes that petitioner's earnings were accumulated during the taxable years in question beyond the reasonable needs of its business (see infra at part 1(b)) and that the Government would thus prevail upon this factual issue even if there has been a shifting of a limited burden of proof, we think that a brief analysis of petitioner's "section 534(c) statement" and the rather disturbing manner in which the entire burden of proof issue has *162 been joined is in order. 24 Subsequent to its receipt of the notice called for by section 534(b) informing it of the impending issuance of a deficiency notice based on section 531, petitioner timely submitted a "statement", pursuant to section 534(c), wherein it set forth certain "grounds" purporting to justify its earnings accumulations. The Commissioner first responded to the contents of that "statement" in his answer to the petitioner herein, arguing, in substance, that the facts alleged in petitioner's statement were insufficient to support the claimed reasons for the accumulations. In its opening brief petitioner asserted, without any accompanying analytical discussion whatever, that its "section 534 statement" was "adequate to establish a justification for the accumulation in question" but that it "in no way relies upon this argument". The Government's reply brief stated that "it was the respondent's understanding that the petitioner did not intend to assert that its "section 534 statement" was sufficient to shift the burden of proof * * * to the respondent", but nonetheless went on to criticize the adequacy of that statement. The posture of the burden of proof issue *163 as it is now before us is obscured not only by its state of incomplete development, outlined above, but also because petitioner has apparently abandoned the principal "ground" asserted in its 25 "statement" upon which it sought to defend its earnings accumulations. The thrust of that "statement", as we understand it, was that HHS "began to encounter difficulty in meeting its monthly rental obligations" during 1965, that petitioner was then burdened by mortgage indebtedness in excess of $560,000, that if HHS "failed to make its monthly rental payments, it appeared that taxpayer's equity in its realty might be jeopardized under the foreclosure provisions of its mortgage agreement", and that petitioner therefore found it prudent to lend "substantially all of its cash" to HHS, with the consequence that "there were insufficient funds for the payment of dividends". But cf. Factories Investment Corporation, 39 T.C. 908, 915-918, affirmed 328 F. 2d 781 (C.A. 2). Only passing reference was made in the "statement" to petitioner's "substantial cash requirements for additional plant and facilities as its tenant prospered and grew", which is the sole justification *164 it now advances for the inquiry at the trial herein. Whichever "ground" petitioner intends to put forth in defense of its accumulations, we think that the facts alleged in the "statement" were far from "sufficient to show the basis thereof" within the meaning of section 534(c). An effective "statement" must assert facts "which, if proved, will tend to 26 establish that the earnings and profits were not accumulated unreasonably". Wellman Operating Corporation, supra, 33 T.C. 162, 183 (emphasis supplied); see also J. Gordon Turnbull, Inc., 41 T.C. 358, 369-371, affirmed 373 F. 2d 87 (C.A. 5); American Metal Products Corporation, supra, 34 T.C. 89, 99-100, affirmed 287 F. 2d 860 (C.A. 8); cf. Chatham Corp., 48 T.C. 145, 146-147. By failing to relate details of the anticipated expansion - including the nature of the facilities to be built, their time or times of construction, their estimated costs, or any allegations revealing a need to finance the construction out of accumulated earnings -, petitioner's "statement" was plainly deficient, by the foregoing standards, in respect of the asserted *165 "expansion" ground. As to the more fully described "protection of real estate equity" ground, the "statement" offered only vague assertions in respect of the liquidity positions of both petitioner and HHS, and it wholly failed to make out a convincing case that the loss of HHS as petitioner's tenant - upon the happening of which the adverse consequences to petitioner outlined in the "statement" are ultimately predicated -, was even remotely foreseeable as a practical matter. Such general allegations as the "statement" contained were insufficient, in our view, to "tend to establish" the reasonableness of the accumulations. 27 (b) Justification of accumulations by reasonable business needs. Petitioner now maintains that its earnings were accumulated to provide funds for the anticipated expansion of its warehouse to 30,000 square feet. It points out that section 537 of the Code defines "reasonable needs of the business" to include "reasonably anticipated needs" and thus attaches little weight to the fact that the planned warehouse was never built. The Government's position is that during the taxable years in issue petitioner's plans for the construction of the new facility had *166 not developed to the point of being "specific, definite, and feasible" within the meaning of section 1.537-1(b) (1) of the Income Tax Regulations, that it was not petitioner's business, but rather that of HHS, which required added warehouse space, and that none of the amounts accumulated during the tax years before us were in any event reasonably justified in view of the expected costs related to the proposed construction and petitioner's other anticipated expenditures. Without passing upon either of the first two points [6] raised by the Government, we hold that it must prevail upon its third argument. *167 28 In 1966, before Scott and Pomper had decided that only a 9,600 square foot warehouse would be built that year and that construction of the 20,000 square foot addition would be postponed for two or three years, they were told that the cost of the additional 20,000 square foot structure would amount to $120,000-$130,000, with some allowance for the possibility of inflation during the period of postponement. That estimate was reconfirmed in early 1967. During the period when the earnings accumulations here in issue were generated, the only other cash outlays that petitioner might reasonably have foreseen were costs relating to the smaller warehouse that was in fact built during 1966, excavation costs of $20,000-$25,000 in connection with the 20,000 square foot facility, and recurring outlays for mortgage principal and interest and Federal income taxes. Little or none of petitioner's accumulated earnings were needed to cover the recurring annual expenditures; petitioner had financed those payments out of current rental income for its entire history, and it continued to do so during the taxable years in issue. In view of HHS" strong economic position during this period, it *168 was hardly likely as of that time that petitioner's earnings would diminish. [7] Nor do we think that 29 accumulations for the full anticipated costs of excavation were reasonably necessary. It was the hope of avoiding those expenditures that was at the heart of the decision to postpone construction of the 20,000 square foot addition - a hope which Scott and Pomper could reasonably expect to be fulfilled. Thus, the principal anticipated outlays for which accumulations might have been necessary were those associated with the warehouse project. In view of petitioner's financial history and expectations as they appeared at the time that project was first planned, and throughout each of the years in question, we think that no further accumulations of earnings were reasonably necessary to cover even the maximum foreseeable cost of the new buildings. *169 As of April 1, 1965, the first day of the taxable years here in issue and before plans for either of the warehouses had begun to crystallize, petitioner had retained earnings of $125,674.54 and liquid assets of over $157,000. [8] Apart from liabilities in respect of its mortgage and income tax indebtedness, which, as noted above, petitioner always paid out of its 30 secure and ample flow of current earnings, petitioner had current liabilities of less than $10,000. Not only were petitioner's previously accumulated earnings thus sufficient to cover the bulk of its anticipated expenditures in connection with the plant expansion, but its rental income was regularly generating an ample cash surplus (after the payment of recurring items and even after the net expenditures made for the 9,600 square foot warehouse that was erected in the taxable year ending March 31, 1967). Most of the excess cash was given back to HHS in the form of loans that would be payable in the event of future expansion. Had petitioner's previously accumulated earnings not been sufficient to cover the costs of any new facility, it was thus more than likely that the difference could readily have been made up *170 from current surplus for the year of construction, without recourse to additional accumulations after April 1, 1965. Moreover, even if the foregoing sources of funds had proven inadequate, the evidence strongly suggests that petitioner would have obtained the necessary financing for expansion through loans. To be sure, Pomper has attested to Scott's distaste for borrowing, but that attitude plainly did not prevent petitioner from resorting to banks whenever it had had insufficient accumulated and current earnings to finance prior construction projects. Indeed, the financing of the 31 74,000 square foot building that was completed in 1964 consumed only a comparatively small portion of the accumulated, *171 liquid surplus then available to petitioner, although substantial borrowing was undertaken in connection with that project. Although loans were taken out only for projects of substantially greater magnitude than the proposed warehouse construction, nothing at all in the record indicates that petitioner's trustees had established a policy of borrowing only when large sums were to be expended. The more appropriate inference to be drawn from the evidence, we think, is that borrowing was used simply whenever it was required, and we are far from convinced that petitioner would not again have turned to a bank if the need had arisen in connection with the anticipated construction.Cf. Nemours Corporation, 38 T.C. 585, 604-605, affirmed per curiam 325 F. 2d 559 (C.A. 3); Battelstein Investment Company v. United States, 302 F. Supp. 320, 328 (S.D.Tex.), affirmed 442 F. 2d 87 (C.A. 5). In view of the substantial amount of earnings already accumulated and available for expenditure at the time the warehouse plans were initially formulated and the great likelihood that any additionally required sums would have been sought and would have *172 been readily available from sources other than earnings retained during the years in question, we hold that 32 the full amounts of the challenged accumulations were beyond petitioner's reasonable business needs. Cf. Novelart Manufacturing Co., supra, 52 T.C. 794, 806, affirmed 434 F. 2d 1011 (C.A. 6), certiorari denied 403 U.S. 918; Wellman Operating Corporation, supra, 33 T.C. 162, 185, 187; section 1.535-3(b) (1) (ii), Income Tax Regs.
(2. Income tax avoidance purpose. Under section 533(a) of the Code (supra footnote 3), our finding that petitioner's earnings and profits were permitted to accumulate beyond its reasonable business needs places upon petitioner the burden of proving "by the preponderance of the evidence" that it was not availed of for the prohibited purpose of avoiding the income tax with respect to its shareholders. To rebut the section 533(a) presumption, petitioner must establish that income tax avoidance was not "one of the purposes" for the unneeded accumulations, i.e., that "tax avoidance motives did not contribute to the decision to accumulate". United States v. Donruss Company, 393 U.S. 297, 301, 309, *173 rehearing denied 393 U.S. 1112. Not only do we think that petitioner has fallen far short of carrying that burden, but the evidence strongly suggests a contrary conclusion. 33 Petitioner maintains that its earnings were retained solely to finance the warehouse project that never came to fruition. As previously illustrated, even if there existed a concrete plan to carry out that project, and even if such a plan was designed to serve petitioner's own businesses needs rather than those of HHS, the availability of ample funds from other sources and the likelihood that petitioner would have sought them obviated the need for accumulation of earnings from the years in question. But even more significantly, there is scarecely any evidence that petitioner's trustees in fact made any kind of forecast at all of petitioner's accumulated earnings requirements vis-a-vis the anticipated costs connected with the proposed warehouse. Of petitioner's three trustees, only Pomper testified at the trial in this case, [9] and conspicuously absent from his testimony was any statement that the trustees had intentionally chosen to retain earnings for the specific purpose of financing the *174 new facility. His observations that Scott had never manifested a desire to avoid personal income taxes, that Scott was reluctant to borrow, and 34 that Scott had indicated that surplus accumulations were necessary to finance certain unspecified improvements were poor substitutes for testimony on behalf of Pomper himself that the trustees had formulated a deliberate policy to accumulate earnings to a particular end associated with the proposed warehouse. Had the trustees made conscious and reasonable determinations in respect of petitioner's business needs and the appropriate manner of financing those needs, we, of course, would not question their business judgment lightly. Cf. Henry van Hummel, Inc. v. Commissioner, 364 F. 2d 746, 749 (C.A. 10), affirming a Memorandum Opinion of this Court, certiorari denied *175 386 U.S. 956; Faber Cement Block Co., 50 T.C. 317, 329, acq. 1968-2 C.B. 2; American Metal Products Corporation, supra, 34 T.C. 89, 101, affirmed 287 F. 2d 860 (C.A. 8). But not only if there lacking in the record any convincing evidence of a revealed intention on the part of the trustees to accumulate earnings specifically for construction of the new warehouse, there is independent evidence strongly suggesting that avoidance of the income tax with respect to Scott and his wife was at least one of the purposes underlying petitioner's failure to make dividend distribution. 35 As our findings show, the Scotts' income tax liabilities would have been considerably greater if petitioner had distributed to them its current earnings for each of the taxable years in question. That sufficient funds were available for such distributions is apparent from the balance of non-income producing funds petitioner had already loaned back to HHS as of April 1, 1965, and the additional net amounts transferred through petitioner's taxable year ending March 31, 1968. Even allowing that portions of those funds might have been required *176 for the unrealized warehouse project, and in fact were used to finance the original 9,600 square foot warehouse, there remained sufficient liquid assets for the disbursement of current earnings in each of the tax years before us. Cf. Faber Cement Block Co., supra, 50 T.C. 317, 327-328, acq. 1968-2 C.B. 2. Moreover, the trustees had not declared a dividend in the entire period of petitioner's existence, and in fact had still not done so as of the close of the taxable year ending March 31, 1970. Such an established pattern is further evidence that the Scotts had no wish to increase their income tax liabilities. Cf. Factories Investment Corporation, supra, 39 T.C. 908, 919, affirmed 328 F. 2d 781 (C.A. 2); Wellman Operating Corporation, supra, 33 T.C. 162, 185; Dixie, Inc., 31 T.C. 415, 430, affirmed 277 F. 2d 526 (C.A. 2), certiorari denied 364 U.S. 827. The failure of the corporate controllers to offer an adequate explanation for the nonpayment of dividends 36 is particularly suspect when those same persons happen also to be the sole shareholders. See Commissioner v. Young Motor Company, supra, 316 F. 2d 267, 272 *177 (C.A. 1), reversing a Memorandum Opinion of this Court; Nemours Corporation, supra, 38 T.C. 585, 604, affirmed per curiam 325 F. 2d 559 (C.A. 3); cf. Kerr-Cochran, Inc., 30 T.C. 69, 83. We conclude that during the years in issue petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders. Decision will be entered for the respondent. Footnotes
1. Unexplained adjustments to earned surplus of $4,801.60 (credit) and $3.56 (debit) were made in the taxable years ending March 31, 1961 and 1969, respectively. ↩
2. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27-1/2 percent of the accumulated taxable income not in excess of $100,000 plus (2) 38-1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531↩ shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. 3. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. (b) Holding or Investment Company. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders. ↩
4. Because of dissimilarity in language between sections 533(a) and 533(b), the measure of proof necessary to overcome each of the respective presumptions may be different. See Latchis Theatres of Keene v. Commissioner, 214 F. 2d 834, 835-836 (C.A. 1), affirming 19 T.C. 1054↩. 5. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. ↩
6. Although we do not find it necessary to pass upon the first two points, we do note that petitioner has made out a strong case in respect of the first one. As to the second point, however, the decided cases appear to furnish support for the Government's position. See Factories Investment Corporation, supra, 39 T.C. 908, 915-917, affirmed 328 F. 2d 781 (C.A. 2); Latchis Theatres of Keene, Inc., 19 T.C. 1054, 1061, affirmed 214 F. 2d 834↩ (C.A. 1); cf. Inland Terminals, Inc. v. Commissioner, F. 2d , (C.A. 4), distinguishing the situation of parent-subsidiary corporations from that of brother-sister organizations. 7. Allegations in petitioner's "section 534(c) statement" suggest a contrary conclusion, but those allegations are wholly without foundation in appropriately submitted evidence and, as such, carry no weight. See Rhombar Co. v. Commissioner, supra, 386 F. 2d 510, 514-515 (C.A. 2), affirming 47 T.C. 75↩. 8. Petitioner has asserted on brief that its "net liquid assets figures are misleading since approximately $111,000 was a non-available long-term advance to H. H. Scott, Inc. carried in a special "improvement account" which * * * had been used mainly to improve Petitioner's facility". However, no maturity date appears to have been fixed in respect of this item, and in our view the record does not support the position that this advance must be treated as a "long-term" debt. ↩
9. There was evidence that Scott himself, although present in the courtroom during a portion of the trial, was not mentally capable of giving testimony in view of a mild stroke which he had suffered some 10 years earlier. (He had also had a "heart attack" in 1970.) The matter is by no means clear and we have not made any finding in respect thereof. ↩